THE VILLAGE OF ALGONQUIN, Plaintiff-Appellant, v. THE VILLAGE OF BARRINGTON HILLS, Defendant-Appellee.

Second District   No. 2—93—0193

Opinion filed December 30, 1993.

Andrew T. Freund and Valeree D. Marek, both of Zukowski, Rogers, Flood & McArdle, of Crystal Lake (David W. McArdle, of counsel), for appellant.

Andrew D. James, of Burke, Warren & MacKay, P.C., of Chicago (George J. Lynch, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, the Village of Algonquin, appeals from a judgment of the circuit court of McHenry County which upheld the validity of a resolution adopted by defendant, the Village of Barrington Hills. The resolution ordered a road to be closed at Barrington Hills' municipal border with neighboring Algonquin. Algonquin sought declaratory and injunctive relief on grounds that the resolution was void. Claiming the trial court erred, Algonquin contends on appeal that adoption of the ordinance was beyond the scope of Barrington Hills' authority and constituted unreasonable, arbitrary, and capricious municipal action.

The thoroughfare at issue here, Spring Creek Road, runs west from Barrington Hills into Algonquin. Haeger's Bend Road, which runs generally in a north-south direction, intersects Spring Creek Road near the western edge of Barrington Hills. Approximately 1,200 feet west of Haeger's Bend, the municipal boundary between Algonquin and Barrington Hills also crosses Spring Creek Road.

During the period from 1982 to 1987, the daily traffic volumes on the roads in Barrington Hills increased on average in excess of 100%. As the result of this increase and the corresponding damage to the roads in Barrington Hills, Robert Lenzini, the Barrington Hills village engineer, sent a confidential memorandum, dated July 31, 1987, to the village administrator of Barrington Hills. Lenzini stated:

> "Village streets are becoming more difficult to maintain even though we are spending greater amounts of money each year. This puts all of the Village staff at a disadvantage when trying to justify the increased spending when the results do not appear to be accomplishing what is expected; namely, improve streets.
>
> All of the problems, of course, are due to lack of structural strength of our pavements due to either an absence of sufficient base or lack of adequate drainage. This was not of great importance 10 to 15 years ago because of the low volume of traffic experienced by the road system, but the secret is now out. Barrington Hills provides a pleasant short cut to or bypass around Barrington. Due to this, we are experiencing an increase in traffic on our roads and the resulting higher rate of failure due to aforesaid deficiencies."

Lenzini then proposed two options for dealing with the problem: (1) reconstruct the roads to accommodate the heavier traffic, at a likely cost of $400,000 to $500,000 per mile, or (2) make village roads less accessible to through traffic by closing selected entry points to the system. Among others, Lenzini suggested that Spring Creek Road be closed at the village limits west of Haeger's Bend Road. The memo concluded:

"We can, of course, continue repairing the roads in the current manner. But if we do, everyone must understand there will be an increased demand on the Village budget for sufficient monies to adequately maintain the Village street systems."

On July 18, 1988, Barrington Hills held a public hearing to discuss the proposed closing of Spring Creek Road. Lenzini made a presentation in which he described the problem and his suggested solutions. Subsequently, on August 22, 1988, Barrington Hills passed resolution No. 88—18 closing Spring Creek Road at the Algonquin/Barrington Hills border. The resolution recited in relevant part:

"WHEREAS, the Village of Barrington Hills maintains certain roads and regulates the traffic thereon; and

WHEREAS, the Board of Trustees has received information from the Village Engineer concerning the future condition of the roads and the traffic volume; and

WHEREAS, the elimination of/or restricting traffic in the opinion of the Village Engineer is a cost effective measure to preserve and maintain the condition of the roads and their utility for the motoring public; ***

NOW THEREFORE BE IT RESOLVED ***:

Section One: The Village President and Board of Trustees finds [sic] and believes [sic] that in the furtherance of public safety Spring Creek Road, west of Haeger's Bend Road is hereinafter a no outlet street to all but authorized emergency vehicles."

On September 1, 1988, pursuant to its resolution, Barrington Hills placed barricades on Spring Creek Road at the village's boundary with Algonquin. Algonquin filed this suit six days later. Following a bench trial, the court entered a memorandum opinion and order. The court made a number of factual findings, ultimately concluding that Algonquin had not adequately shown that Barrington Hills' adoption of the resolution to close Spring Creek Road was improper. Algonquin now contends that this finding was contrary to the manifest weight of

the evidence. Findings of fact made by the trial court sitting without a jury will not be disturbed unless they are against the manifest weight of the evidence. (*Harris Trust & Savings Bank v. Village of Barrington Hills* (1989), 133 Ill. 2d 146, 157; *Hausmann v. Hausmann* (1992), 231 Ill. App. 3d 361, 365.) For a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. (*Schackleton v. Federal Signal Corp.* (1989), 196 Ill. App. 3d 437, 445.) We affirm.

As Algonquin acknowledges, Barrington Hills has the right, pursuant to statute, to regulate the use of its streets. (See 65 ILCS 5/11—80—2, 11—80—20 (West 1992); 605 ILCS 5/7—101 (West 1992).) Algonquin also recognizes the well-established rule that a municipal enactment, adopted pursuant to statutory authority, is presumptively valid. (See *Coryn v. City of Moline* (1978), 71 Ill. 2d 194, 199; *Greater Peoria Sanitary & Sewage Disposal District v. Hermann* (1987), 153 Ill. App. 3d 398, 401.) However, Algonquin asserts that resolution No. 88—18 was void *ab initio* because it was adopted for an improper purpose.

■ Although stated in a number of different ways, Algonquin essentially takes the position that the true purpose of the resolution is to serve private rather than public interests. In its first formulation of this argument Algonquin claims the resolution serves only the interests of three Barrington Hills trustees and other Barrington Hills residents who live along Spring Creek Road. Barrington Hills does not dispute that a municipal enactment which allows public property to be devoted to a purely private purpose is void because it is beyond the power which the municipal officials possess. (See Ill. Const. 1970, art. VIII, §1(a); *O'Fallon Development Co. v. City of O'Fallon* (1976), 43 Ill. App. 3d 348, 354-55.) Rather, Barrington-Hills responds that Algonquin did not make this argument at trial and may not make it now. It is well settled that issues not raised in the trial court cannot be raised for the first time on appeal and are deemed waived. (*Meerbrey v. Marshall Field & Co.* (1990), 139 Ill. 2d 455, 467.) Algonquin did not point out to us either in its reply brief or at oral argument where it raised this precise issue. Consequently, it is waived. Even if it were not waived, though, Algonquin could not prevail on this argument.

Algonquin focuses only on the restrictions on use of Spring Creek Road itself, asserting that Barrington Hills residents, but no others, can use Spring Creek to access Haeger's Bend Road. However, Algonquin did not produce evidence to support this position. It did not show, for example, that nonresident motorists, who happened to al-

ready be driving within Barrington Hills, could not take Spring Creek west, the same as any resident of the village. Nor did it show that nonresidents could not enter the Village of Barrington Hills from the west at some other location and then proceed to Spring Creek Road and travel on it in either an east or west direction. On the contrary, the evidence was that all motorists, whether residents or not, may freely use any of the village streets. The only thing they may not do is enter or leave the western edge of Barrington Hills on Spring Creek Road. Moreover, as will be shown, the resolution is aimed at protecting Barrington Hills' overall street system from the deleterious effects of increasing traffic volume. Thus, while it is true that Barrington Hills residents will benefit from better streets, so will any other member of the public driving on those streets. All in all, the evidence does not support Algonquin's argument that the only people benefited by the resolution are the trustees and other residents who live along Spring Creek Road. Consequently, Algonquin has not shown that resolution No. 88—18 was adopted for purely private purposes and is, therefore, void.

The circumstances of this case are totally unlike those in the authority invoked by Algonquin. In *People ex rel. Burton v. Corn Products Refining Co.* (1918), 286 Ill. 226, a municipal ordinance authorized a private corporation to build a bridge over and across the street in order to connect the corporation's buildings, which were located on either side of the street. A subsequent ordinance vacated that portion of the street located on the corporation's property. Soon after this ordinance was approved the corporation fenced the vacated section of the street and excluded the public from using it. Both ordinances were held to be void since they were beyond the power of the city council. The bridge, which was built solely for the private use of the corporation, was an obstruction to free use of the street by the public. Further, since the public could no longer use the street at all, the only benefit of the vacating ordinance was to the corporation. In contrast, in this case nonresidents are not barred entirely from any road in Barrington Hills, including Spring Creek Road. At worst, they are inconvenienced. Further, the benefit of closing the road flows to the motoring public at large rather than a private entity. *Burton* is not helpful to Algonquin.

■ In another attack on the purpose of resolution No. 88—18, Algonquin asserts that, despite language in the resolution itself to the contrary, there were no safety considerations related to the closing of Spring Creek Road. Section one of resolution No. 88—18 represents that the village president and the Barrington Hills board of trustees

found and believed that it was "in the furtherance of public safety" to close Spring Creek Road. Algonquin refers to the quoted language as the "perfunctory recitation of the key phrase necessary to the validity of all ordinances" and insists that no evidence was presented at trial to show that the issue of safety was ever considered by the Barrington Hills village manager or the Barrington Hills board of trustees before the road was closed. On the contrary, according to Algonquin, the only real concerns were financial ones. There is no merit to Algonquin's argument.

In support of its contention regarding the absence of safety considerations, Algonquin focuses on documents prepared by Barrington Hills' village engineer, Robert Lenzini, and language found in resolution No. 88—18 itself. It is true, as noted by Algonquin, that the confidential memo prepared by Lenzini, as well as Lenzini's notes and presentation at the public hearing, dwelt on the financial aspects of maintaining and or improving the streets in Barrington Hills. However, we would be hard pressed to say that Lenzini's concern was devoid of safety considerations. For one thing, in the memo Lenzini spoke of the need for a bond issue to pay for upgrading the roads, if the village chose that option. Relative to the cost of improvement Lenzini noted that standards of construction would have to be established "with due consideration given to drainage and safety." Moreover, even though Lenzini did not otherwise expressly speak of safety, his memo and oral presentation addressed the condition of the village's street system, a fundamental part of the village infrastructure which is traversed daily by the public in cars, trucks and other motor vehicles, as well as in or on nonmotorized vehicles and on foot. It is reasonable to conclude that the memo was prompted, at the most basic level, by concerns that the continuing deterioration and failure of village streets would eventually present a risk to the safety of members of the public using those streets. We think it could be inferred that Lenzini's attention to solutions and cost factors arose from a more fundamental concern about the welfare of the traveling public.

With regard to the language of the resolution, the preamble stated that the trustees had been given information regarding traffic volume and future road conditions and that they had been told of the effectiveness of eliminating or restricting traffic in order to "preserve and maintain the condition of the roads and their utility for the motoring public." It is apparent from these statements that Barrington Hills perceived the closing of Spring Creek Road as a method of reducing the volume of traffic using village streets. Reduction of traffic volume, in turn, was seen as a way of maintaining the streets in a

safe condition without excessive expenditures. Despite Algonquin's insistence to the contrary, we believe it could be inferred from the resolution that the ultimate objective of the Barrington Hills board of trustees was to insure the safety of the public users of village streets and to protect the public interest in having a usable roadway system. Algonquin's claim that the objective of resolution No. 88—18 was merely financial, and not reflective of an interest in public safety, is not persuasive.

■ Algonquin next contends that, even if resolution No. 88—18 was not void at the outset due to an impermissible purpose, it is invalid because it is unreasonable. While there is no question that a municipal enactment, adopted under statutory authority, enjoys a presumption of validity (see *Coryn v. City of Moline* (1978), 71 Ill. 2d 194, 199), such an ordinance must bear a reasonable relationship to the public interest sought to be protected, and the means chosen must be a reasonable method of achieving the objective (*City of Carbondale v. Brewster* (1979), 78 Ill. 2d 111, 114-15; *Village of Caseyville v. Cunningham* (1985), 137 Ill. App. 3d 186, 190). Accordingly, in order to overcome the presumption in favor of a municipal resolution, and thereby prove its invalidity, it must be shown " 'by clear and affirmative evidence that the ordinance constitutes arbitrary, capricious and unreasonable municipal action; that there is no permissible interpretation which justifies its adoption, or that it will not promote the safety and general welfare of the public.' " (*Triple A Services, Inc. v. Rice* (1989), 131 Ill. 2d 217, 226, quoting *City of Decatur v. Chasteen* (1960), 19 Ill. 2d 204, 210, and citing *Petterson v. City of Naperville* (1956), 9 Ill. 2d 233, 246-47.) The party challenging a municipal resolution bears the burden of establishing its invalidity. (*City of Batavia v. Allen* (1991), 218 Ill. App. 3d 545, 547.) With both the underlying principles and the heavy burden placed on a party challenging a municipal enactment clearly in mind, we turn to an examination of Algonquin's contentions regarding the validity of Barrington Hills' resolution.

Algonquin essentially argues that the resolution is unreasonable because it amounts to an attempt by Barrington Hills to segregate or totally cut itself off from other municipalities. According to Algonquin, the closing of Spring Creek Road constitutes an impermissible "Berlin Wall" around Barrington Hills, which effectively eliminates all nonresident traffic from all Barrington Hills roads and streets. Algonquin relies first on *Chicago National Bank v. City of Chicago Heights* (1958), 14 Ill. 2d 135, where the court upheld an ordinance closing a section of street to vehicular traffic. We agree with Algonquin that

the *Chicago Heights* court implied that an attempt to prohibit traffic on *all* city streets would be an unreasonable exercise of the city's power to regulate its streets. In a proper case we would probably also adopt the rationale of such implication. However, Algonquin's effort to paint Barrington Hills' ordinance as an attempt at total prohibition finds little support in the evidence. There was *no* evidence that Barrington Hills had taken *any* steps to totally bar nonresident traffic from all or any of its streets. While Spring Creek Road was an access point to Barrington Hills from the west, there was no evidence that Barrington Hills had closed off *every* entrance to the village from any direction.

Algonquin relies also on *dicta* in *City of Cleveland v. City of Shaker Heights* (1987), 30 Ohio St. 3d 49, 507 N.E.2d 323, where the court, similar to the *Chicago Heights* court, indicated that an attempt by a municipality to blockade its streets in such a way as to effectively segregate itself from other municipalities would be an unreasonable exercise of the power to regulate. Once again, we agree with these observations. However, on its facts, the Ohio case is not helpful to Algonquin.

In *City of Cleveland*, in order to prevent traffic from using its roadway system as a cut-through to other destinations, Shaker Heights barricaded two streets and closed the entrance to another at its border with Cleveland. Cleveland alleged the closings caused it financial detriment. After finding that the closing merely inconvenienced the motoring public and that the record did not show any total blockage of traffic through Shaker Heights, the Ohio Supreme Court stated:

> "Adverse extraterritorial traffic effects on a neighboring municipality are not, standing alone, enough to overcome the presumption of the validity of a legislative enactment taken under a municipality's home rule powers." (*City of Cleveland*, 30 Ohio St. 3d at 53, 507 N.E.2d at 326.)

Cleveland had not shown that Shaker Heights' traffic plan was clearly unreasonable, arbitrary, capricious, or pursued in bad faith. The court concluded that the "wisdom of Shaker's plan or whether it was the best answer to a perceived problem are, in truth, not proper subjects for judicial inquiry." (*City of Cleveland*, 30 Ohio St. 3d at 54, 507 N.E.2d at 327.) In this case, Algonquin, like Cleveland, produced evidence of adverse effects on extraterritorial traffic from a road closure. Also, however, like Cleveland, Algonquin failed to show a total blockage of traffic through Barrington Hills. *City of Cleveland* teaches that, under these circumstances, Barrington Hills' actions were not

improper. As we read it, *City of Cleveland* is highly supportive of the conclusion we reach in this case.

Algonquin has not otherwise shown that resolution No. 88—18 was not suited to achieve its objective. As we discussed above, the concern underlying the village's efforts to preserve its streets was the welfare of the public using Barrington Hills' roads. It is not disputed that Barrington Hills could better or more easily maintain its roads if the traffic volume was restricted. Accordingly, we cannot say the objective of the resolution was not reasonably related to the public interest sought to be served. The question remains, though, whether Barrington Hills selected a reasonable method of accomplishing its goal.

Algonquin takes the position that its neighbor chose an unreasonable method since (1) Barrington Hills did not need to close Spring Creek Road because traffic on Spring Creek was minimal for that type of road, and (2) although total reconstruction of Spring Creek was not necessary, Barrington Hills considered no options except total reconstruction or closure of the road. With regard to the first point, Algonquin's argument appears to be that Spring Creek Road was adequate to handle the traffic and, therefore, did not call for closure. The difficulty with Algonquin's position is its narrow focus on only Spring Creek Road.

Algonquin relies heavily on an independent traffic capacity analysis (the Metro Report) of the traffic along Spring Creek Road and other roads in Barrington Hills. The report, issued in 1989, concluded that all roadways tested were operating at acceptable capacity or levels of service. Gerald Salzman, Algonquin's expert traffic analyst, basically agreed with the conclusions in the Metro Report and also conducted his own independent traffic capacity analysis of Spring Creek Road. He determined that Spring Creek, between the Algonquin/Barrington Hills border and Haeger's Bend Road, had the capacity to handle the existing and projected future traffic on Spring Creek Road. He further concluded that, from a traffic capacity analysis, Spring Creek could be safely traveled both presently and in the future. However, neither the Metro Report nor Salzman's testimony addressed Barrington Hills' true matter of concern, *i.e.*, the deterioration of *all* of its streets caused by increased traffic.

First of all, Salzman's own study was confined to the 1,200 or so feet of Spring Creek between Haeger's Bend and the Algonquin/Barrington Hills border. He made no study of any other Barrington Hills roadways. Even more significantly, according to Salzman's direct testimony, analysis or evaluation of the condition of the substructure of

the road is not involved in a traffic capacity analysis. When asked to explain Salzman stated:

"[T]he traffic analysis deals with the capacity of the roadway, essentially, *** the width, how many cars we can accommodate. And, it is essentially a snapshot in time. During some day or some peak hour this is the number of cars that is crossing a road. And, that road has or has not the capacity to accommodate that.

The structure is more of a measure of the life of that road ***. Provided there is a road, [structure] is not really relevant to the capacity at that moment."

The Metro Report confirmed Salzman's testimony that the conditions of a road's substructure are not considered in a traffic capacity analysis. In the "Roadway System Análysis" section of the report it is stated: "It should be mentioned that roadway structural conditions are not considered in these analyses." Hence, while correctly noted by Algonquin, it is irrelevant that Lenzini may have agreed with the conclusions of the Metro Report. Neither that report nor Salzman's testimony is helpful to Algonquin in showing that traffic volume was not hastening the general deterioration of Barrington Hills roads.

Moreover, there was affirmative evidence of genuine problems with Barrington Hills streets. The memo from Robert Lenzini noted that the problems were due to the lack of structural strength of village pavements as a result of an insufficient base or inadequate drainage, and, with the traffic increase, Barrington Hills was now experiencing a higher rate of road failure. At the public hearing Lenzini said the traffic was causing a great deal of damage to village streets, including potholes, breakups, and longitudinal rutting of the street surfaces. Lenzini testified similarly at trial, adding that he suggested closing some roads in order to decrease the rate of deterioration and aid in maintenance.

Algonquin attacks Lenzini's expertise and the soundness of the basis for his testimony that there were problems with the subsurfaces of Barrington Hills roads. The record, however, reflects that Lenzini was a licensed professional engineer who had long been involved in, among other things, the design and maintenance of municipal streets and road systems, as well as the inspection of street construction. In addition he had been the Barrington Hills village engineer for 12 years prior to this litigation. During that time he planned for and supervised repairs made on Barrington Hills roads. Lenzini testified that through his work he became familiar with the surface as well as the subsurface or subbase of the roads in Barrington Hills. Collec-

tively, this record does not reveal any significant weaknesses in Lenzini's testimony.

Furthermore, Lenzini's testimony was not contradicted. If anything, Algonquin's witnesses confirmed much of what Lenzini said about the roads in Barrington Hills. Although he found Spring Creek Road presently safe for travel, Frank Wellwerts, a civil engineer retained by Algonquin, rendered the opinion that certain improvements should be made to Spring Creek west of Haeger's Bend in the very near future. In the witness' words: "As the pavement is allowed to continue to grow old and be fatigued by additional loading, if something isn't done on that, it will become a problem." During cross-examination Wellwerts indicated that traffic volumes and nature were a factor in his determinations. He then testified that he had personally inspected the 1,200 feet of Spring Creek Road west of Haeger's Bend and found it to be "in fair condition" with some of it in "fair to poor condition." He described the section of road as "not true to its shape," "warped," and "distorted." He estimated that 5% of the 1,200 feet of pavement had already failed. As can be seen, Wellwerts' testimony supported, albeit somewhat indirectly, Lenzini's claim that increasing traffic was causing the accelerated breakdown of Barrington Hills' street system.

In addition, Frank Cuda, Algonquin's village engineer, testified on cross-examination that he agreed that the roads in Barrington Hills had been built from rural farm to market roads to the existing village streets and that several of the streets in Barrington Hills were in a state of incipient failure. Cuda further agreed that "although these roads can serve local traffic adequately their design and construction are such that present and future usage of the roads, when subject to this present and projected traffic, will result in a relatively high maintenance cost." Similarly, Delbert Miller, highway commissioner for the Algonquin Township Highway Department, and also an Algonquin witness, agreed that all the roads in Barrington Hills were "horse and buggy sealcoat roads." He called them "Model A Roads" and agreed that sealcoat, which he described as a "dust control measure," did not have any structural strength to it. Insofar as it supported Lenzini's testimony about Barrington Hills roads, the testimony of Cuda and Miller, like that of Wellwerts, did little to show that closing Spring Creek Road was an unreasonable method of achieving Barrington Hills' goal of a reduction in the volume of traffic on the village's total roadway system.

In its final argument Algonquin urges that the means chosen to achieve the objective of resolution No. 88—18 was not reasonable

since closure of Spring Creek Road was not necessary to protect the public. Algonquin points out that Barrington Hills officials were presented with only two options: total reconstruction or closure of the road. However, according to Algonquin, Barrington Hills did not have to adopt either of these extreme measures. It could have rehabilitated Spring Creek for far less than the cost of reconstruction. Algonquin's expert, Frank Wellwerts, inspected Spring Creek west of Haeger's Bend on several occasions, reviewed traffic volume reports and projected future traffic for Spring Creek, and reviewed the results of tests of the subsurface of Spring Creek Road. He concluded that reconstruction was not necessary and recommended the road be rehabilitated, at a cost of approximately $140,000 per mile.

Once again, Algonquin's focus solely on Spring Creek Road is self-defeating. The goal of resolution No. 88—18 was to reduce the volume of traffic on Barrington Hills' *system* of roadways, not just Spring Creek Road. Robert Lenzini testified that the option to reconstruct applied to 35 miles of roads, and Spring Creek was just one of those roads. Thus, rehabilitation of that one section of the system would not have solved the problems caused by traffic on the remaining streets and roads. In fact, as Barrington Hills points out, rehabilitation of Spring Creek would have cut directly against the objective of resolution No. 88—18 in that it probably would have increased the traffic on the roads in Barrington Hills. Consequently, that Spring Creek Road could possibly have been rehabilitated rather than reconstructed did not render unreasonable the means (closure) chosen by Barrington Hills to achieve the end sought by the resolution (reduced volume of traffic).

However, even if rehabilitation of Spring Creek Road were a viable method of accomplishing the aim of Barrington Hills' resolution, Wellwerts' testimony, *vis-a-vis* that of Lenzini, amounts only to a difference of opinion as to the best way to proceed with the improvement of Spring Creek Road. In our view, the testimony of the experts and the evidence in the record shows that this area of opinion is fairly debatable. "Where there is room for a legitimate difference of opinion concerning the reasonableness of a particular ordinance, it is improper for the courts to substitute their judgment for that of the legislative body." (*Wehrmeister v. County of Du Page* (1957), 10 Ill. 2d 604, 609.) We think this principle applies also to the reasonableness of the means selected to achieve the objective of a municipal resolution. Hence, we would not in any event interfere with the judgment of the Barrington Hills trustees on this matter.

In our opinion, Algonquin was not able to show, by clear and affirmative evidence, that resolution No. 88—18 was arbitrary, capricious or unreasonable; that it would not promote the safety and general public welfare, or that there was no permissible interpretation which justified its adoption. (See *Triple A Services, Inc. v. Rice* (1989), 131 Ill. 2d 217, 226.) Since Algonquin was not able to overcome the presumption in favor of the municipal enactment, the trial court's findings upholding resolution No. 88—18 were not against the manifest weight of the evidence and will not be disturbed.

For the reasons stated above the judgment of circuit court of McHenry County is affirmed.

Affirmed.

McLAREN and COLWELL, JJ., concur.