THE CITY OF EVANSTON, Plaintiff-Appellee, v. THE CITY OF CHICAGO
*et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—94—3280

Opinion filed March 29, 1996.—Rehearing denied May 1, 1996.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellants.

Jack M. Siegel, Corporation Counsel, of Evanston, and Altheimer & Gray, of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff, the City of Evanston, filed a complaint against the defendants, the City of Chicago and Joseph Boyle,[1] commissioner of the Department of Transportation, seeking a mandatory injunction directing the defendants to remove a 2,000-foot guardrail median that the defendants installed in the center of Howard Street. The center of Howard Street marks the boundary between Evanston and Chicago; Evanston lies to the north and Chicago to the south of the boundary. After a bench trial, the circuit court granted the injunction, requiring the defendants to remove the guardrail and not erect such a guardrail in the future. The defendants have removed the barrier and appeal the court's decision. On appeal, Chicago and Boyle contend: (1) Chicago constructed the barrier as a reasonable exercise of its police power; and (2) the court erred by excluding evidence concerning Chicago's reasons for building the Howard Street barrier.

BACKGROUND

Evanston and Chicago are home rule units. They are divided by Howard Street with Evanston lying to the north and Chicago lying to the south. In February 1991, developers approached Evanston city officials regarding construction of a shopping center on a 23-acre site then owned by Bell & Howell. This site was bordered by Kedzie on the west, Hartrey on the east, and Howard on the south. It was originally improved with a building of 780,000 square feet and used as a manufacturing and distribution facility. The residential development on the south side of Howard Street in Chicago was constructed after the development of the property and consists almost entirely of single-family homes. The area to the east of the site in Evanston is also zoned for residential use.

Between February and November 1991, the developers and Evanston city officials conducted negotiations about the development of the site. In November 1991, the Evanston city council gave conceptual approval to a proposed shopping center on the Bell & Howell site. The assistant city manager of Evanston notified the commissioner of planning and development of Chicago of the proposed development. Numerous community meetings were held in Evanston and Chicago, including three meetings with the North Boundary Homeowners Association, representing the residents in Chicago lying south of the

---

[1]Before the filing of defendant's reply brief, the Chicago city council confirmed Thomas Walker as commissioner of the Department of Transportation, succeeding Commissioner Boyle. Defendants have filed a motion to substitute Commissioner Walker for Commissioner Boyle.

site. Alderman Bernard Stone of the 50th ward also attended the meetings.

Evanston then entered into a redevelopment agreement between Evanston, Dayton Hudson Corporation, American Stores Properties Inc., and Best Buy, Inc., for the redevelopment of the site for a shopping center. Evanston designated the redevelopment project for tax increment financing. Evanston issued a total of $9 million in bonds, $7,500,000 of which were devoted to eligible projects costs for the shopping center. The principal and interest on the bonds were to be repaid from the revenues derived from the shopping center. Financial projections indicated that the revenues from the shopping center were sufficient to pay principal and interest and yield substantial revenues to Evanston through increased sales and real estate taxes.

As a result of meetings with the Evanston city council and neighborhood groups from Chicago and Evanston, the proposed plan for the shopping center underwent substantial modifications. Among the modifications made were additional landscaping provided in front of the shopping center and the erection of a $3^1/2$-foot masonry wall along Howard Street. This wall was designed to shield car headlights in the parking lot from any possible impact upon residents to the south. Also, traffic channelization was provided at Albany and Howard Streets to prevent traffic from entering Chicago. Several other proposed modifications were offered and a $100,000 mitigation fund was to be set aside to address unforeseen neighborhood concerns. These particular modifications were accepted by the North Boundary Homeowners Association.

In February 1992, Alderman Stone proposed erection of a concrete barrier of approximately six inches in height to be extended from Kedzie Avenue to Francisco Avenue at or near the center line of Howard Street. The then acting commissioner of the Department of Transportation advised the Chicago city council committee that the department could not support the proposed barrier. The reasons for the department's opposition were that such a barrier would cause a much greater accident potential along that section of Howard Street and would increase traffic in the residential streets south of Howard Street. Also, emergency response would be impractical, emergency vehicles could not pass other moving vehicles, and there were no opportunities for westbound left turns.

On March 13, 1992, the committee on transportation and public way of the Chicago city council submitted a report recommending that the city council pass an amended order directing the commissioner of the Department of Transportation to erect a center divider at a minimum of nine inches to a maximum of three feet in height

south of the center line of West Howard from 100 feet east from North Francisco to North Kedzie without any openings. At the city council meeting of March 25, 1992, the council passed the following:

> "ORDERED that the Commissioner of the Department of Transportation is hereby authorized and directed to give consideration to the erection of a center divider at a minimum of nine inches (9") to a maximum of three feet (3') in height south of the center line of West Howard Street east of North Francisco Avenue to North Kedzie Avenue without any openings at North Francisco, North Sacramento and/or North Albany Avenues."

After the passage of the order, further meetings were held between Evanston and the developers with residents of Evanston and Chicago and Alderman Stone in an effort to solve any problems arising out of the construction of the shopping center.

In contemplation of the possible erection of the barrier, Evanston and Bell & Howell entered into an agreement whereby Bell & Howell would rebate to the purchasers $4 million if the barrier remained in place at the time of the opening of the Target store. In turn, Evanston would be obligated to reimburse Bell & Howell $2 million in the event that the sales tax revenues fall 20% below the financial projections and/or there is a 10% reduction in the valuation of the shopping center.

On May 26, 1993, without notice to Evanston, construction commenced upon a $2^1/_2$-foot-high guardrail along the center line of Howard Street for a distance of approximately 2,000 feet without any openings from Kedzie Avenue on the west to California Avenue on the east. The barrier remained in place on the date of trial, but three temporary openings of 36 inches were provided.

Evanston filed a two-count complaint against Chicago and its commissioner of the Department of Transportation. Count I sought a declaratory judgment holding that Chicago and Boyle had no authority to erect a center divider on Howard Street as it abutted Evanston and that the erection of the divider was contrary to the public health, safety and welfare, and constituted an abuse of the power to regulate traffic upon the streets. It sought a mandatory injunction directing Chicago to immediately dismantle the divider. Count II sought a declaration that the erection of the divider was without lawful authority and an injunction enjoining Boyle from erecting or maintaining any type of divider along Howard Street and ordering an immediate removal of the existing barrier. Chicago filed a counterclaim seeking to restrain Evanston from proceeding with the construction of the shopping center on the Evanston side of Howard Street.

At trial, Evanston called Evanston's city manager, Eric Anderson,

as its first witness. Anderson testified that the effect of reducing the access to the shopping center will reduce the sales in the shopping center and will reduce the sales tax revenue, making it less likely Evanston will be able to support services and operations. He also testified that the barrier reduced the ability to provide fire service to the area of the development and to the area north of the development because of the elimination of westbound entrances on three of the four entrances. The barrier extended past Gray Street, so that fire trucks coming down McCormick Street would not be able to reach those houses right on the street or the houses that are off Gray Street and back on Dobson and Brummel Streets. He testified that the barrier inhibited the ability of police officers to pursue. The barrier also increased the length of the route that an ambulance must take to get to a particular location. Emergency medical services use Howard Street to get to St. Francis Hospital and Evanston Hospital.

Boyle was called as an adverse witness. He testified that prior to meeting with Alderman Stone regarding the new development, he requested his traffic engineers to consider alternatives to deal with the flow of traffic from the new development. Boyle decided to erect the barrier, but he did not give any specific standards or criteria in writing for determining when to erect a guardrail of the type that was erected on Howard Street.

Valerie Jarrett, commissioner of planning and development for Chicago, was called as an adverse witness. She testified that her department never made any studies or analysis as to the impact of the development on the surrounding area. She did not recommend that the barrier be installed, and her department did not have any standards in writing that governed the construction of guardrails, such as that which were installed on Howard Street.

Rolf Campbell, a planning and zoning consultant and landscape architect, testified that the existence of the barrier would have an adverse effect on Evanston and Chicago, particularly upon those properties within the immediate vicinity, because it precludes direct access to the shopping center with the exception of Kedzie for eastbound traffic. Traveling eastbound on Howard Street, the signalized intersection at the barrier was the only means of turning left into the shopping center. Kedzie would become overloaded with left-turning movements, causing traffic to back up westward to the signalized intersection of McCormick Boulevard. Campbell further testified that the barrier was a traffic hazard and a hazard to pedestrians as some of them might step over the top of the barrier, with moving traffic going in both directions. Also, people living within the residential area directly south of Howard Street that are westbound on

Howard would not be able to turn directly into their streets. The barrier would disrupt the traffic flow to the shopping center, increase traffic on residential areas to the south and force homeowners to take a more difficult route. Furthermore, because the barrier narrows the moving lane within Chicago, buses will have more difficulty traveling on Howard Street and attempting to maneuver around traffic.

Frank Kaminsky, deputy chief of the Evanston police department, testified that Howard Street is patrolled by both jurisdictions. The Evanston police department has occasion to go into Chicago in the course of its duties, in vehicle pursuit, foot pursuits, and mutual aid requests. Routinely, the officers will back up each other. He had several concerns about the wall in reference to pedestrian safety, vehicular safety, and some of the operational issues for the police department. He noticed that there was a vehicle that had collided with the barrier at Kedzie Street on the Chicago side. He stated that the wall provided an unnecessary impediment to police activity in the City of Evanston and prevented access to that area. If the unit was coming eastbound on Howard Street and there was a situation on the Evanston side, they would not have access to it. They would have to park the vehicle on the Chicago side and officers would have to leave their car if they intended to pursue. He has had occasion to have the police in Evanston go into Chicago on hot pursuits. The barrier would prevent those types of situations or constitute a safety issue in those pursuits. Kaminsky further testified that emergency vehicles at times have to cross the center line. These include police vehicles and ambulance and fire vehicles. He concluded that the erection of the barrier was not necessary to protect the public health and safety.

Henry D'Ambrosia, the vice-president of administration for Bell & Howell, was the next witness. D'Ambrosia was of the opinion that access is a key to a commercial property and if access is impaired, people will not come and, therefore, the sales volumes and the real estate value will be greatly reduced. He believed the real estate value would diminish greatly in excess of the 10% and the sales volume in his opinion would go down considerably more than the 20% from their projections.

David Miller, a traffic engineer, was president and founder of Metro Transportation Group. Metro conducted a traffic impact analysis for the shopping center site. Howard Street is an east-west arterial street extending about 8 to 10 miles from the lake westward toward Park Ridge. The traffic is approximately 20,000 vehicles per day. It handles Chicago Transit Authority buses in both directions. To the east of the site is a local street, Hartrey, which has two lanes

on one or both sides. To the west of the site is Kedzie, running north and south, carrying less than 5,000 vehicles per day.

It was Miller's opinion that the barrier was not necessary for traffic operation or safety. With the barrier, traffic volumes on Howard are unnecessarily restricted from making movements along that section of the road. It presents a hazard for traffic on Howard in the eastbound direction and it affects the movement and flow of emergency vehicles along Howard Street. For traffic westbound on Howard, it restricts access into the residential street south of Howard at Francisco, Sacramento and Albany. It is an extreme measure that is not warranted from a traffic engineering standard. Because of the barrier, the potential for sideswipe accidents and fixed-object accidents is increased. Miller also testified that the barrier reduced flexibility of emergency vehicles, either eastbound or westbound on Howard Street. It was also Miller's opinion that the traffic volumes on the residential streets in the City of Chicago will increase on the streets south of Howard, as well as the travel distances. He also opined that the barrier has no relationship to safety and, in fact, creates safety and operational problems. The barrier is not necessary in order to restrict or prevent incursion of shopping center traffic into the residential area south of Howard. There is no incentive for traffic from the shopping center to flow through the residential area. The only traffic that would be using these streets would be the people in the neighborhood who desire to go to the shopping center.

Lorraine H. Morton, mayor of the City of Evanston, testified that she met with Alderman Stone after the barrier was erected. Alderman Stone told her that this was what his constituents wanted. She was of the opinion that it is not safe for any traffic going down Howard Street. The barrier would interfere with ambulances and fire department trucks and even with regular police vehicles. It is made worse when there is any type of repair work being done on either side of the street.

Allen Berkowsky, division chief of the Evanston fire department, testified that the fire department utilizes Howard Street for emergency services or fire prevention in the area in which the barrier is located. The department has in the past had occasion to go into Chicago for the purpose of fire suppression or fire emergency service. It was Berkowsky's opinion that anytime you interfere with or impede access, you impair the fire department's ability to deliver lifesaving services. There is no access when you are near that barrier to maneuver vehicles. Once a vehicle is stopped, other vehicles will be inhibited from access because traffic will get caught behind the vehicle that is stopped.

Fire and emergency vehicles use both sides of Howard Street and they cross the center line. They could not do so now where the barrier is located. The Evanston fire department has had occasion to provide suppression and emergency medical service to buildings and persons in Chicago and there is a mutual aid agreement between the two fire departments. It was Berkowsky's opinion that the barrier would impede the department's ability to reach some streets in Chicago and would increase response time in emergencies.

Evanston called Thomas Smith as an adverse witness. He was the deputy commissioner of the Chicago Department of Transportation. He testified that the barrier made a portion of Howard Street on the Chicago side operate as a one-way street. He did not recommend the order because he felt it was providing a lesser opportunity for access to the Chicago community.

Evanston also called Thomas Kaiser as an adverse witness. He was the assistant chief engineer in charge of the planning and design division of the Chicago bureau of traffic. He testified that he did not recommend approval of the barrier because it would cause greater accident potential along the section of Howard Street. He did not believe that the barrier on Howard Street was necessary for the protection of the motoring public using Howard Street. He stated that he discussed his reservations about the guardrail with Alderman Stone. The alderman still supported the median after discussion.

Judy Aiello, the assistant city manger for the City of Evanston, testified that the traffic modifications discussed between the public and representatives of the property owners' association would have the required effect of eliminating any traffic impact on the properties to the south and would address the concerns raised by the Chicago residents about traffic entering their neighborhood. In her opinion, as a municipal official and city planner, the barrier will prohibit Evanston from providing adequate fire and police services to the residents of Evanston and from fulfilling the obligations to provide mutual aid assistance to Chicago. She also testified that the barrier made it more difficult for the traveling public to utilize Howard Street because they must be more cautious.

Defendant presented its case and also called Rolf Campbell as its first witness. He testified that he had looked at the change in intensity between the prior use of the Bell & Howell site and its use as a shopping center. He believed that the number of loading docks, the number of trips, the intensity of the truck traffic and nonpersonnel car traffic were greater with Bell & Howell than the shopping center.

Claire Blumenthal, a resident of Chicago, testified that her home is in the north boundary area at 2900 West Birchwood. She stated that since the barrier on Howard had been up, she had not noticed any ill effects. However, she did notice a change in the type and amount of traffic in the residential streets. There were fewer large trucks going through and there is less traffic going north and south. There also were more trucks going through the area before the barrier went up.

Wesley Kennedy, a resident of Chicago, testified that he had not done any formal traffic study, but, as a resident in the area, he observed the level of traffic on his street and on the streets in the neighborhood. After the erection of the barrier, he observed that all forms of traffic had declined substantially.

Paul LaDoucur, Jr., a lieutenant in the Chicago fire department, testified that the erection of the barrier on Howard Street had not prevented him from putting out fires in the area of the barrier.

Donald Corsello, a paramedic officer of the Chicago fire department, testified that the barrier had not really affected his ability to respond to calls for paramedic services.

Bruce Rottner, a Chicago police sergeant, testified that the barrier did not prevent members of the Chicago police department from doing their work. On cross-examination, he testified that emergency vehicles are allowed to cross over from one lane to another during the course of delivering emergency services. It would not be possible for a vehicle heading in the eastbound direction on Howard Street to cross over into the westbound lane on the Evanston side when delivering a passenger to St. Francis Hospital in the area where the barrier is located.

Chicago recalled Judy Aiello, assistant city manager of Evanston. She testified that she contacted Ms. Jarrett, hoping to upgrade the signal at Kedzie, install a new traffic signal at Hartrey, and upgrade the traffic signal at Dodge, which corresponds to California in Chicago. She stated that, if the signals are coordinated, it provides for better traffic flow and addresses the concern of keeping traffic going and preventing any traffic backup.

Alderman Bernard Stone of the 50th ward testified that he asked that the March 25 order not be implemented because a negotiating team formed in the North Boundary Homeowners Association was meeting with the developers for the purpose of trying to iron out the differences. On cross-examination, Alderman Stone testified that the committee's recommendation was to authorize and direct the commissioner of transportation to erect a barrier. He testified that, in the city council of Chicago, an order coming from the corporate authority is, in fact, an ordinance.

Following testimony, the trial court entered a memorandum opinion and order. The court made a number of factual findings, ultimately concluding that Commissioner Boyle did not have authority to erect a barrier and the barrier did not promote the health, safety and welfare of the public.

## ANALYSIS

■ The City of Chicago contends that the construction of the barrier was a reasonable exercise of police power. Chicago is a home rule unit of local government under the 1970 Constitution. Ill. Const. 1970, art. VII, § 6. The 1970 Constitution provides, in relevant part:

"(a) *** Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt.

* * *

(m) Powers and functions of home rule units shall be construed liberally."

Home rule is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the State who might disagree with the particular approach advanced by representatives of the locality involved or fail to appreciate the local perception of the problem. *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 502, 470 N.E.2d 266 (1984); see *Triple A Services, Inc. v. Rice*, 131 Ill. 2d 217, 230, 528 N.E.2d 267 (1989). This power which a municipality enjoys extends to the regulation of the use of its streets, but this power must be strictly construed. See 65 ILCS 5/11—80—2 (West 1992); *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 216 Ill. App. 3d 474, 480, 576 N.E.2d 984 (1991), *aff'd*, 156 Ill. 2d 399, 620 N.E.2d 1040 (1993).

■ Defendants assert that the trial court employed the incorrect standard to assess the propriety of Chicago's decision to construct the barrier. In the court's memorandum of law, the court stated, "[T]he barrier constitutes a restriction in the use of the public street which has no basis in the doctrine of overruling necessity" and the court cited to *Chicago Park District v. Canfield*, 370 Ill. 447, 19 N.E.2d 376 (1939). In *Canfield*, our Illinois Supreme Court stated that a municipality's right to regulate its streets "must find basis in the doctrine of overruling necessity, or bear some substantial relation to

the public good." *Canfield*, 370 Ill. at 451. Our Illinois Supreme Court has also held that a municipality's regulatory and police powers over its public streets are subject to a reasonableness limitation. *City of Chicago Heights v. Public Service Co.*, 408 Ill. 604, 608, 97 N.E.2d 807 (1951); *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 216 Ill. App. 3d at 481; *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 156 Ill. 2d at 414. A determination of reasonableness must be made in each case by weighing the particular circumstances in light of the aim of the restriction. *Devon Bank v. Department of Transportation*, 95 Ill. App. 3d 690, 697, 420 N.E.2d 605 (1981); *American Telephone & Telegraph Co.*, 156 Ill. 2d at 414; *Chicago National Bank v. City of Chicago Heights*, 14 Ill. 2d 135, 138-39, 150 N.E.2d 827 (1958). Further, one who challenges an ordinance as failing this test of minimum rationality bears the burden of proving "by clear and affirmative evidence that the ordinance constitutes arbitrary, capricious and unreasonable municipal action, that there is no permissible interpretation which justifies its adoption, or that it will not promote the safety and general welfare of the public." *Village of Algonquin v. Village of Barrington Hills*, 254 Ill. App. 3d 324, 331, 626 N.E.2d 329 (1993); *Triple A Services, Inc.*, 131 Ill. 2d at 226, citing *City of Decatur v. Chasteen*, 19 Ill. 2d 204, 210, 166 N.E.2d 29 (1960).

■ Notwithstanding defendants' assertion that the trial court employed the incorrect standard to assess the propriety of Chicago's decision to construct the barrier, we believe that the complete transcript is in derogation of this contention. The trial court found that "Evanston had proven the material issues of fact" because "the barrier bears no relationship to the public welfare" and "the barrier is not necessary or reasonable to protect the traveling public on Howard Street or the residential properties lying to the south in the City of Chicago." Therefore, it is clear that the trial court used the reasonableness standard in its determination that Chicago had abused its exercise of the police power.

Chicago relies on *Village of Algonquin* and *Devon Bank* to argue that the barrier is reasonably related to protecting Chicago from substantial traffic, congestion, noise and clutter caused by the shopping center. In *Village of Algonquin*, the defendant, Barrington Hills, passed a resolution ordering a road to be closed at Barrington Hills' municipal border with neighboring Algonquin. The defendant contended that barricading Spring Creek Road was reasonable to offset the damage to Barrington Hills' roads due to increased traffic. The plaintiff, the Village of Algonquin, asserted that the barricade had the effect of allowing Barrington Hills residents, but no others,

to use Spring Creek Road to access Haeger's Bend Road, which intersects Spring Creek Road. The circuit court concluded that Algonquin had not adequately shown that Barrington Hills' adoption of the resolution to close Spring Creek Road was improper. The appellate court affirmed, stating that the barricade did not restrict motorists' use of Barrington's streets. The only thing motorists may not do is enter or leave the western edge of Barrington Hills on Spring Creek Road. While motorists may be inconvenienced, the benefit of the barricade flowed to the public at large by preventing the roads from deteriorating. The court concluded that Algonquin was unable to show by clear and affirmative evidence that the resolution was arbitrary, capricious or unreasonable, that it would not promote the safety and general public welfare, or that there was no permissible interpretation that justified its adoption. *Village of Algonquin*, 254 Ill. App. 3d at 337.

In *Devon Bank*, developers planned and began construction of a new shopping center. The center petitioned the Illinois Department of Transportation (IDOT) for permission to construct two driveways for access to Waukegan Road. IDOT denied the petition but granted the center permission to build a single, full-access driveway. As a condition for this permit, IDOT required the center to construct an insurmountable median barrier on Waukegan Road. The plaintiff, a land trustee for an existing shopping center located across the street, sought a mandatory injunction to compel IDOT to remove the median from the center of Waukegan because the location of the median reduced the plaintiff's driveway from a full-access to a right-in, right-out entrance. Defendant stated that the purpose for the action was to funnel all traffic for the shopping centers on both sides of the street to a central location in order to provide the safest traffic patterns. No formal traffic count or access study of the location was made prior to deciding to build the median. The decision was based on the district permit engineer's personal observations. However, expert testimony revealed that the barrier provided the best possible method of safely and effectively accommodating projected traffic movements. He testified that leaving an opening in the median at Glen Oak's south driveway would be detrimental from a safety point of view, posing a serious traffic conflict point. The trial court ruled that the barrier was unreasonable and ordered removal of part of the barrier that blocked plaintiff's driveway. The appellate court reversed. The court noted that the plaintiff presented no evidence to show that IDOT's decision was unrelated to safety or traffic concerns. Although the limitation of the center's access to Waukegan Road was "unfair," the court stated that this limitation was reasonable to further the inter-

est of public safety. Furthermore, the court held that the trial judge erred in relying upon his personal observations of the site and in ignoring expert testimony that removal of the barrier would create a traffic conflict point and lessen the safety of the road. *Devon Bank*, 95 Ill. App. 3d at 699.

The *Village of Algonquin* and *Devon Bank* cases cited by the City of Chicago to support its contention are distinguishable from the case *sub judice*. Here, defendant contends that the erection of the barrier was reasonable because it would prevent substantial traffic that would add congestion, noise and clutter in Chicago. We do not believe this goal translates into protection of the public's health, safety and welfare. In fact, unlike the barriers in *Algonquin* and *Devon Bank*, we believe the barrier in this case puts the public's safety at risk. First, Chicago did not make any traffic studies to determine the effects of the divider on traffic safety. There are no set standards for the construction of barriers of this nature regarding when such barriers should be installed. Second, Evanston's expert witnesses testified that the barrier was not necessary or required for the regulation of traffic and the barrier was a traffic hazard. The barrier would impair the provision of police services to Evanston and hinder mutual aid to Chicago. The erection of the barrier also would impair fire protection to the residential portion of Evanston that was blocked by the barrier as well as the passage of emergency vehicles. Third, the barrier would promote accidents, including fixed-object accidents and sideswipes. Fourth, the barrier would actually increase traffic in the residential areas to the south. Chicago did not present any expert testimony to rebut any of Evanston's claims regarding the reasonableness of the barrier. Accordingly, Evanston provided clear and affirmative evidence that the resolution to erect the barrier was unreasonable and that it would not promote the safety and welfare of the public.

■ Defendant next contends that Commissioner Boyle was authorized to order construction of the barrier. The Chicago Municipal Code grants the commissioner of transportation the power and duty "[t]o plan, design and construct traffic signs, devices, pavement markings, safety zones and other facilities for new and existing streets." Chicago Municipal Code § 2—102—030(e) (1994). However, the commissioner cannot proceed without legislative authority from the city council. We agree with Evanston and the trial court that if the above section were construed to give authority without council approval, it would clearly be unconstitutional as a delegation of legislative authority to an administrative officer without standards. *Dean Milk Co. v. City of Aurora*, 404 Ill. 331, 336, 88 N.E.2d 827 (1949). Here,

there were no standards established by Chicago to indicate when and where a barrier of this nature should be constructed. Furthermore, the resolution authorized Boyle only to *consider* the erection of the barrier. Therefore, we also hold that Boyle did not have authority to construct the barrier without the express approval of the council.

■ Chicago further contends that the court erred in finding that the resolution was an improper means by which to grant Boyle the authority to erect the barrier. Chicago relies on *People ex rel. Stenzel v. Ireland*, 28 Ill. App. 2d 291, 171 N.E.2d 241 (1960), for the proposition that passage of an ordinance is not the only valid means for a local legislative body to exercise or delegate its authority. In *Stenzel*, the appellate court held that removal of board members of the fire and police commission by a motion to remove was not invalid on the ground that it should have been done by ordinance. The court stated that it found no authority for the proposition that the council's action had no validity. *Stenzel*, 28 Ill. App. 2d at 294.

However, it is well established that a resolution is inadequate to accomplish that which must be done by means of an ordinance. *City of Tuscola v. D&B Refuse Service, Inc.*, 131 Ill. App. 3d 168, 170, 475 N.E.2d 633 (1985). An act of a unit of local government that affects the conduct of the general public or has a continuing force and effect must be embodied in an ordinance. *Tuscola*, 131 Ill. App. 3d at 170; *Village of Gulfport v. Buettner*, 114 Ill. App. 2d 1, 9, 251 N.E.2d 905 (1969). Here, testimony established that the erection of the barrier would have had a continuing force and effect on the health, safety and welfare of the general public.

■ Lastly, defendant contends that Chicago was prejudiced by the circuit court's exclusion of testimony concerning Chicago's reasons for building the Howard Street barrier. Chicago asserts that this testimony was relevant to the issue of the need for the wall as expressed by community residents in the neighborhood south of Howard Street. The trial court found this testimony to be too speculative. We agree. Opinion testimony that is based purely on guess, surmise or conjecture is inadmissible and is tantamount to no evidence at all. *Poulakis v. Taylor Rental Center, Inc.*, 209 Ill. App. 3d 378, 383, 568 N.E.2d 196 (1991). Under ordinary circumstances, an opinion or conclusion of a nonexpert witness may not be admitted into evidence, and his testimony must be confined to a report of the facts. Further, while an expert witness may express an opinion on an ultimate fact in the case, a nonexpert witness may not. *Robinson v. Greeley & Hansen*, 114 Ill. App. 3d 720, 730, 449 N.E.2d 250 (1983).

In this case, Chicago's offers of proof showed that Claire Blumenthal and Alderman Bernard Stone would have testified that residents

who lived near the shopping center site were justifiably worried about the increased traffic, noise, pollution, litter and crime that they believed the shopping center would generate during its 24-hour-a-day operations and the resulting decline in the value of their property. This evidence was purely speculative. The witnesses did not testify to any facts to demonstrate why the erection of the barrier was reasonable, but instead expressed unsubstantiated fears regarding the impact that the development could have on their community.

Chicago contends, however, that the testimony was not hearsay because it was offered not for the truth of the constituents' statements but rather for the fact that those statements were made and the statements motivated Alderman Stone to suggest building the barrier. We agree with Evanston that the motivations behind building the barrier are irrelevant to the issue of whether the barrier was a proper exercise of police power by promoting the health, safety and welfare of the public. Thus, the trial court did not err in excluding this testimony.

For the reasons cited herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, P.J., and GORDON, J., concur.