CITY OF CLEVELAND ET AL., APPELLEES, *v.*
CITY OF SHAKER HEIGHTS, APPELLANT.

[Cite as Cleveland *v.* Shaker Heights (1987), 30 Ohio St. 3d 49.]

(No. 86-561—Decided April 22, 1987.)

*Marilyn G. Zack,* law director, *Craig S. Miller* and *Donald F. Black,* for appellee city of Cleveland.

*Nick A. Mandanici,* law director, *Howard S. Stern* and *Ross S. Cirincione,* for appellee city of Warrensville Heights.

*Margaret Anne Cannon,* law director, *Kelley, McCann & Livingstone, Stephen M. O'Bryan* and *Thomas J. Lee,* for appellant.

*Sheldon M. Sager, Roy E. Lachman* and *Sheldon D. Schecter,* urging reversal for *amicus curiae* Lomond Association.

WRIGHT, J. The issues presented for our resolution are twofold. First, we must determine the propriety of the standing of one municipality to challenge the actions of a neighboring municipality in partially closing

---

[1] See Appendix, *infra,* at 59.

several streets to the financial detriment of the complainant. If standing exists, we must then resolve whether injunctive relief is available to the complaining municipality on the theory that the street closings were either clearly unreasonable, an abuse of discretion or taken in bad faith.

We reject Shaker's contention that appellees lacked standing to challenge the traffic plan. In the recent case of *Middletown* v. *Ferguson* (1986), 25 Ohio St. 3d 71, 25 OBR 125, 495 N.E. 2d 380, this court cited with approval the following statement on the issue of standing contained in *Sierra Club* v. *Morton* (1972), 405 U.S. 727, 731-732:

" 'Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends on whether the party has alleged * * * a "personal stake in the outcome of the controversy." * * *' " *Id.* at 75, 25 OBR at 129, 495 N.E. 2d at 384.

At trial, Cleveland and Warrensville not only alleged, but demonstrated, inconvenience and economic expenditures as a direct result of the barricade scheme. The record demonstrates that thousands of vehicles were diverted on a daily basis as a result of Shaker's plan, and that appellees did suffer direct and significant inconvenience. In view of the record,[2] we agree with the courts below that appellees both alleged and demonstrated the existence of a personal stake in the outcome of the proceeding sufficient to afford standing to seek injunctive relief.

Having concluded that appellees possessed sufficient standing to institute the underlying action, we now consider Shaker's contention that injunctive relief was erroneously granted against the implementation of the traffic plan. Appellees do not suggest that Section 3, Article XVIII, of the Ohio Constitution is without great efficacy. That section provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

This court has consistently held that the aforementioned provision — commonly referred to as the Home Rule Amendment — confers a high measure of sovereignty upon municipalities and we have recognized that municipalities have broad powers and duties with respect to streets and highways within their limits. *Cincinnati Motor Transp. Assn.* v. *Lincoln Hts.* (1971), 25 Ohio St. 2d 203, 54 O.O. 2d 317, 267 N.E. 2d 797. However, absolute power with respect to this phase of self-government must be tempered by legislation enacted by the General Assembly pursuant to the state's police powers affecting matters of statewide concern.

---

[2] The record demonstrates that Shaker's traffic plan diverted somewhere between 7,000 and 14,000 vehicles a day within Cleveland and Warrensville.

Appellees challenge the street closings as being violative of R.C. 723.01,[3] which requires municipalities to keep their streets "open." While we would not ordinarily discuss this issue, since it was not dealt with by the court of appeals, we think it important to address the argument that the streets in question, Avalon, Ingleside and Scottsdale, are not now "open" within the meaning of R.C. 723.01.

Interestingly, appellees make no claim that the subject streets are closed to vehicular traffic. Instead, they ascribe to the term "open" a higher meaning, that being that once a street is constructed and opened to vehicular traffic, the municipality cannot change or reduce the traffic patterns thereon, especially where it connects with an arterial street of a bordering municipality. Appellees' argument, taken to its logical extreme, leads to the conclusion that all streets must remain open to two-way traffic and cannot be converted into one-way avenues.

To accept this contention would negate a vast amount of useful traffic planning implemented throughout this state. The trial court found no conflict between Shaker's plan and the Ohio Manual of Uniform Traffic Control Devices. Appellees cite no authority for this strained construction of the term "open" which, if accepted, would forever bind municipalities to the traffic patterns on streets which existed when they were opened. Accordingly, we reject appellees' proposed construction of the term and hold that the requirement under R.C. 723.01 that municipalities keep their streets "open" does not preclude reasonable regulations of vehicular traffic and traffic patterns by a municipality.

Appellees next contend that a municipality can be enjoined from totally blocking access through its confines thereby creating what is labeled as a "Berlin Wall" or islanding effect. While such conduct would probably be unreasonable on its face and, hence, subject to injunctive relief, the record in the instant case fails to demonstrate the existence of anything remotely resembling a total blockage of traffic through Shaker's confines. Indeed, while appellees have made claims of substantial detriment as a result of Shaker's actions, the inconvenience to the traveling public appears modest. Residents driving south into Cleveland or north into Shaker are now required to travel somewhere between a mile to a mile and one-half in order to circumvent the barricades at Avalon and Ingleside. While some inconvenience unquestionably exists, there is nothing akin to a total blockage since appellees' residents continue to have access through Shaker and, conversely, Shaker's residents have access to their neighbor-

---

[3] This section provides:

"Municipal corporations shall have special power to regulate the use of the streets. The legislative authority of a municipal corporation shall have the care, supervision, and control of the public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation, and the municipal corporation shall cause them to be kept open, in repair, and free from nuisance."

ing municipalities. In other words, there is a minimum of circuity of travel resulting from Shaker's traffic plan.

The critical consideration is whether Shaker's traffic plan was clearly unreasonable and/or arbitrary, capricious or pursued in bad faith given the facts appearing in the record, for it was incumbent upon appellees to demonstrate the existence of one of these factors. Accord *Willott* v. *Beachwood* (1964), 175 Ohio St. 557, 559, 26 O.O. 2d 249, 250-251, 197 N.E. 2d 201, 203. It is apparent, however, that the courts below were preoccupied with the extraterritorial effects of Shaker's traffic plan, even though they were unable to find the existence of any of the aforementioned factors. Adverse extraterritorial traffic effects on a neighboring municipality are not, standing alone, enough to overcome the presumption of the validity of a legislative enactment taken under a municipality's home rule powers. Accordingly, the party challenging the enactment must demonstrate that the traffic plan is either clearly unreasonable, or that the plan is arbitrary, capricious or pursued in bad faith. See *Eastland Woods* v. *Tallmadge* (1983), 2 Ohio St. 3d 185, 2 OBR 726, 443 N.E. 2d 972; *Willott* v. *Beachwood, supra.* We have, with a high degree of consistency, shielded municipal legislation from judicial interference on the basis that a court's power in such matters is extremely limited. In short, courts may not usurp the legislative function by substituting their judgment for that of the legislative body.

This is not to say, however, that Shaker had unlimited authority to barricade any or all of its streets which happen to border on a neighboring municipality. For instance, as we previously indicated, injunctive relief would lie, on the basis of unreasonableness alone, if a municipality attempted to blockade its streets in a manner which effectively segregated itself from other municipalities. Likewise, injunctive relief would lie on the basis of unreasonableness alone, if a municipality attempted to unilaterally barricade a principal highway connecting a neighboring municipality. Shaker's traffic plan did not approach such conduct and, accordingly, we are unable to find its traffic plan subject to injunctive relief on the basis that it had no rational basis and was unreasonable on its face. Absent such a showing, it was incumbent upon appellees to demonstrate that the traffic plan was arbitrary, capricious or taken in bad faith. *Willott* v. *Beachwood, supra.* This they were unable to do, as the trial court specifically rejected appellees' proposal that Shaker be found to have abused its discretion in erecting the barricades. Indeed, the record fully supports the trial court's decision in this regard.

We considered a situation which has some similarity to the case at bar in *Eastland Woods, supra,* where we addressed the authority of the city of Tallmadge to close one of its streets adjacent to a border with the city of Akron. We recognized that Tallmadge's goal of promoting tranquility in a residential area was justified and that a legislative determination was to be presumed valid absent proof of fraud, bad faith or an abuse or discre-

tion. The wisdom of Shaker's plan or whether it was the best answer to a perceived problem are, in truth, not proper subjects for judicial inquiry.

In *Willott* v. *Beachwood, supra,* at 559, 26 O.O. 2d at 250-251, 197 N.E. 2d at 203, this court asked the critical question which, in the instant case, the courts below ignored:

"* * * [T]he important and fundamental question is: Where the council of a municipality makes a determination of land-use policy which involves the *control of traffic, the volume of traffic, the burden of traffic* * * * and the land-use consistent with the best interests of the general welfare and prosperity and development of the community as a whole, does the court have authority to invalidate such an ordinance in the absence of a showing that such power has been exercised in such an arbitrary, confiscatory and unreasonable manner as to be in violation of constitutional guarantees?

"The answer to this question is that the courts are without authority to interfere." (Emphasis added.)

We conclude that absent the special type of circumstances to which we have previously alluded, a decision by a city regarding connection to or vacation of streets at or within its borders is not subject to injunctive relief by a neighboring municipality. The judgment of the court of appeals is therefore reversed and final judgment is entered for appellant.

*Judgment reversed.*

MOYER, C.J., LOCHER and DOUGLAS, JJ., concur.

HOLMES and H. BROWN, JJ., concur in part and dissent in part.

SWEENEY, J., dissents.

HERBERT R. BROWN, J., concurring in part and dissenting in part. The majority has properly noted that this appeal requires a determination of two issues. First, did Cleveland have standing to challenge the acts of Shaker Heights in barricading two streets and closing the entrance to another at the border between Cleveland and Shaker? Second, and if standing is found, is Cleveland entitled to injunctive relief to stop the action taken by Shaker?

I agree with the majority's determination that Cleveland has demonstrated standing to challenge Shaker's traffic plan. The action by Shaker has an extraterritorial effect on Cleveland and the record supports the findings by the trial judge that Cleveland suffers engineering costs, signage costs, maintenance costs and snow plowing costs, as well as a total diversion of traffic on two Cleveland streets.

The condition where one municipality borders another has become commonplace as population growth has led to strip city development. Standing should be accorded to a municipality where damage has been

done to that municipality by the act of its neighbor. In this interdependent context, the question of standing depends upon whether one municipality has alleged a stake (which I take to mean an interest of substance) in the act of its neighbor. Such could be described as the rule of extraterritorial effect.

Having resolved the standing issue, it is necessary to measure the action taken by Shaker. The majority, in stating the issues, presents the test as one of whether "the street closings were either clearly unreasonable, an abuse of discretion or taken in bad faith." Clearly unreasonable, it seems to me, means without logical basis, *i.e.*, conduct from which an arbitrary purpose may be inferred. I believe that such standard accurately reflects the law and due consideration to the Home Rule Amendment. *Willott* v. *Beachwood* (1964), 175 Ohio St. 557, 26 O.O. 2d 249, 197 N.E. 2d 201; *Eastland Woods* v. *Tallmadge* (1983), 2 Ohio St. 3d 185, 2 OBR 726, 443 N.E. 2d 972; *Froelich* v. *Cleveland* (1919), 99 Ohio St. 376, 124 N.E. 212; *Union Sand & Supply Corp.* v. *Fairport* (1961), 172 Ohio St. 387, 16 O.O. 2d 244, 176 N.E. 2d 224; *Leslie* v. *Toledo* (1981), 66 Ohio St. 2d 488, 20 O.O. 3d 406, 423 N.E. 2d 123; *Refreshment Services Co.* v. *Cleveland* (1980), 63 Ohio St. 2d 89, 17 O.O. 3d 54, 406 N.E. 2d 1115; *Cincinnati* v. *Wegehoft* (1928), 119 Ohio St. 136, 162 N.E. 389.

The standard used by the court of appeals (which affirmed the judgment of the trial court in granting injunctive relief to Cleveland) is unsatisfactory.[4] The court of appeals errs when it opines that an ordinance which has an extraterritorial effect does not come within the powers of self-government.

The action taken by Shaker is action taken within the municipal boundaries of Shaker. Regulation of the streets of a municipality is traditionally an internal affair of that municipality even though such regulation causes some circuity of route or inconvenience. *Cincinnati Motor Transp. Assn.* v. *Lincoln Hts.* (1971), 25 Ohio St. 2d 203, 54 O.O. 2d 317, 267 N.E. 2d 797. Examples would include one-way streets, limitations of through traffic and regulations to change traffic patterns.

Where, as here, the actions of the municipality have an extraterritorial effect upon another municipality, that other municipality has standing. In other words, the courthouse door is open to the other municipality. However, it does not follow that the existence of an extraterritorial effect deprives the acting municipality of the benefit of the Home Rule Amendment as suggested by the court of appeals. Our holding in *Beachwood* v. *Bd. of Elections of Cuyahoga Cty.* (1958), 167 Ohio St. 369, at 371, 5 O.O. 2d 6, at 7, 148 N.E. 2d 921, at 923, contains language that may have led

---

[4] The court of appeals held:

"The trial court properly applied the commonly accepted standards of good cause, detriment to the general interest, and reasonableness in determining whether Shaker's acts, with extraterritorial effects, were proper."

the court of appeals to the above determination,[5] and must be distinguished. In *Beachwood,* the boundary of a municipality was changed, thus altering the boundary of its neighbor. Such action clearly imposes a dominion over the adjoining territory which is distinguishable from, and beyond the extraterritorial effect of, such actions as were taken by Shaker. Absent such an assertion of dominion over adjoining territory, the concept of extraterritorial effect is one limited to the issue of standing.

As stated previously, I believe the correct standard is, as enunciated by the majority, one of whether the street closings were clearly unreasonable, an abuse of discretion or taken in bad faith. However, it is necessary to examine the decision of the trial court to determine whether the findings meet that standard. This the majority fails to do.

The trial court detailed sixty separate findings of fact, including the following: that the streets in Cleveland which connect with the streets in Shaker have been dedicated since the 1920s and have been interconnected and paved since 1949; that Shaker acted without effort to collect data in Cleveland or to collect data jointly with Cleveland; that Shaker at no time studied the extraterritorial effects of its plan; that no recognized standard traffic engineering criteria were used to evaluate its plan; that Shaker did not make a traffic engineering decision in closing the three streets; that Shaker's designation of problem streets had no factual traffic engineering basis; that all professional traffic engineers agreed that paired one-way streets would have solved any perceived problem; and that all professional traffic engineers recommended improving arterial roadways before looking at more restrictive measures.

From those findings a determination can be made that the action of Shaker was clearly unreasonable or arbitrary.

It is axiomatic that the trier of fact, and not this court, should make determinations of fact (unless the evidence of record fails to support such determinations). *Gates* v. *Bd. of Edn. of River Local School Dist.* (1967), 11 Ohio St. 2d 83, 40 O.O. 2d 91, 228 N.E. 2d 298; *Ross* v. *Ross* (1980), 64 Ohio St. 2d 203, 204, 18 O.O. 3d 414, 415, 414 N.E. 2d 426, 428; *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 280, 8 O.O. 3d 261, 262, 376 N.E. 2d 578, 579; *Simon* v. *Lake Geauga Printing Co.* (1982), 69 Ohio St. 2d 41, 45, 23 O.O. 3d 57, 60, 430 N.E. 2d 468, 471.

While it is clear that the findings made by the trial court could support a conclusion that would warrant injunctive relief against Shaker, it is not apparent that the trial judge utilized a proper standard of law. The trial court specifically rejected proposed findings of law that Shaker's scheme was unreasonable as a matter of law and that Shaker's scheme constituted

---

[5] "Where a proceeding is such that it affects not only the municipality itself but the surrounding territory beyond its boundaries, such proceeding is no longer one which falls within the sphere of local self-government but is one which must be governed by the general law of the state."

an abuse of corporate power. Instead, the trial court found that the actions of Shaker were: (1) unreasonable and (2) detrimental to the general interest. Such standards are less than those to which Shaker is entitled.

Accordingly, I would reverse the determination by the court of appeals and remand this action to the common pleas court for further proceedings.

HOLMES, J., concurs in the foregoing opinion.

SWEENEY, J., dissenting. While the majority correctly asserts that the cities of Cleveland and Warrensville Heights possessed the requisite standing to maintain this action, see *Middletown* v. *Ferguson* (1986), 25 Ohio St. 3d 71, 25 OBR 125, 495 N.E. 2d 380, I believe that the holding herein establishes a dangerous precedent that may seriously undermine the manner in which adjacent cities cooperate with one another in all aspects of daily living. In particular I am troubled by this court's sanctioning of the barricades erected by the appellant city of Shaker Heights, as well as the manner in which the majority analyzes this cause in order to arrive at its decision.

Since the instant cause is unquestionably one of first impression, I find it curious that the majority opinion challenges the courts below for failing or ignoring to ask the "critical question" posed in *Willott* v. *Beachwood* (1964), 175 Ohio St. 557, 26 O.O. 2d 249, 197 N.E. 2d 201. Assuming *arguendo* that the lower courts were remiss in answering this question, a simple explanation for the lower court's supposed failure is that the *Willott* case is inapposite to the cause before this court. *Willott* concerned zoning and the power of municipalities to establish zoning districts. No such issues are involved in the cause *sub judice*. As it applies to the instant cause, *Willott, supra,* is at best irrelevant to the important issues posed herein. Likewise, *Eastland Woods* v. *Tallmadge* (1983), 2 Ohio St. 3d 185, 2 OBR 726, 443 N.E. 2d 972, is of little or no value to the determination of the instant case, because that decision concerned a street vacation implemented pursuant to standards set forth in R.C. 723.04 and 723.05. Any similarities existing between the cause herein and *Eastland Woods, supra,* are readily distinguishable as to the facts and the law.

I am also troubled by the majority's method of endorsing the actions undertaken by Shaker Heights, by creating a "straw man" argument to defeat appellees' argument concerning the term "open" as contained in R.C. 723.01. In my opinion, appellees' contention that Shaker Heights' actions violate R.C. 723.01 raises a legitimate argument that should be seriously considered by this court. The majority's assertion that appellees' R.C. 723.01 argument "taken to its logical extreme, leads to the conclusion that all streets must remain open to two-way traffic and cannot be converted into one-way avenues * * *" is patently absurd. To reject appellees' argument in this vein, based on some unfounded fear that cities would become powerless to change traffic patterns on their thoroughfares,

ignores the true thrust of the argument advanced by appellees, and determines the issue on factors or considerations that are not germane to the cause before us. I believe that a careful review of the record reveals that Shaker Heights undertook the extreme remedy of barricading the streets in issue because it could not satisfy the requirements of street vacation set forth in R.C. 723.04 *et seq.*

In my view, while the new standard adopted by the majority provides, at the very least, a somewhat facially acceptable attempt to arrive at a fair judicial resolution of this matter, a more appropriate guideline would be one that weighs public policy considerations in conjunction with the grants and limits of authority set forth in R.C. 723.01. As this court noted in *Chickerneo* v. *Society National Bank* (1979), 58 Ohio St. 2d 315, at 320, 12 O.O. 3d 298, at 300-301, 390 N.E. 2d 1183, at 1186:

"Public policy is a  legal principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare. The principle must be applied with caution and limited to those circumstances patently within the reasons upon which the doctrine rests. *Lamont Building* v. *Court* (1946), 147 Ohio St. 183, 185; *Gugle* v. *Loeser* (1944), 143 Ohio St. 362, 367."

Given the unusual nature of the actions propounded by appellant, along with the utter dearth of precedent to guide courts in the instant factual context, I believe that a standard that employs public policy considerations would be a fairer and more equitable approach.

In any event, I am of the opinion that the application of either the majority's standard or the one proposed herein would compel an affirmance of the court of appeals' decision in this case. For these reasons, I must respectfully dissent.

# APPENDIX