[Cite as *Shaker Hts. ex rel. Cannon v. DeFranco*, 2012-Ohio-3965.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 98063

---

## CITY OF SHAKER HEIGHTS, EX REL. CANNON, ET AL.

PLAINTIFFS-APPELLEES

vs.

## SYLVIA DEFRANCO, ET AL.

DEFENDANTS-APPELLANTS

---

## JUDGMENT:
## AFFIRMED

---

Civil Appeal    from the
Cuyahoga County Court of Common Pleas
Case No. CV-753323

**BEFORE:**    Stewart, P.J., Cooney, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**    August 30, 2012

**ATTORNEYS FOR APPELLANT**

Maurice A. Thompson
Christopher B. Burch
1851 Center for Constitutional Law
208 E. State Street
Cleveland, OH    43215

**ATTORNEYS FOR APPELLEE THE CITY OF SHAKER HEIGHTS**

Stephen L. Byron
Ice Miller, LLP
4230 State Route 306
Suite 240
Willoughby, OH 44094

Margaret A. Cannon
Jonathon W. Groza
Ice Miller, LLP
600 Superior Avenue, East
Suite 1701
Cleveland, OH    44114

William M. Ondrey Gruber
Interim Director of Law
City of Shaker Heights
3400 Lee Road
Shaker Heights, OH    44120

**ATTORNEY FOR APPELLEE SPRINGFIELD TOWNSHIP**

Laura A. Abrams
The Abrams Law Firm LLC
365 Wood Street
Batavia, OH 45103

**ATTORNEYS FOR APPELLEE THE CITY OF LOVELAND**

Franklin A. Klaine, Jr.
Joseph J. Braun

Strauss & Troy
The Federal Reserve Building
150 East 4th Street
Cincinnati, OH 45202-4018

**ATTORNEY   FOR APPELLEE THE CITY OF OAKWOOD**

Robert F. Jacques
City of Oakwood Law Department
30 Park Avenue
Dayton, OH 45419

**ATTORNEYS FOR APPELLEES ROBERT H. BAKER, IN HIS OFFICIAL CAPACITY ONLY, AS FISCAL OFFICER FOR THE COUNCIL TO PROTECT OHIO'S COMMUNITIES AND THE COUNCIL TO PROTECT OHIO'S COMMUNITIES**

L. James Juliano, Jr.
Matthew T. Fitzsimmons, III
Nicola, Gudbranson & Cooper, LLC
Republic Building
25 W. Prospect Avenue
Suite 1400
Cleveland, OH   44115

MELODY J. STEWART, P.J.:

{¶1} The city of Shaker Heights, the city of Loveland, the city of Oakwood, and Springfield Township (Hamilton County) (collectively referred to as "the governments"), instituted this declaratory judgment action in response to the demand of taxpayer-appellee Sylvia DeFranco, seeking a declaration regarding their participation in the Council to Protect Ohio's Communities ("CPOC"), a regional council of governments that used municipal and township funds to hire a lobbying group to advocate against the repeal of Ohio's estate tax. DeFranco argued that a local government violates the law by using taxpayer funds to influence state tax legislation that would affect communities other than its own, and that it cannot hire a lobbying group to do indirectly that which it cannot do directly. The court held that the cities and township were acting within their lawful power to join a regional council of governments for purposes of lobbying the state government and that they did not abuse their discretion by using taxpayer funds to lobby state officials for policies that impose or maintain taxes on Ohio residents beyond the individual borders of their communities.

I

{¶2} The parties stipulated to the facts in cross-motions for summary judgment and submitted the matter to the court on briefs, seeking a ruling as a matter of law. We review the court's legal conclusions with no deference.

{¶3} The evidence showed that the four governments involved derive a significant amount of their operating revenue from the estate tax imposed by R.C. 5731.02(A). For example, in 2009, estate tax receipts amounted to nearly ten percent of Shaker Heights' general revenues; in 2009, estate tax receipts amounted to just over 11 percent of Loveland's general revenues. All of the governments asserted that a repeal of the estate tax would have significant adverse consequences to their operating budgets.[1]

{¶4} These governments decided to form the CPOC for the stated purpose of "preserv[ing] our communities by maintaining revenue sources and amounts that support services and expenditures that benefit citizens of local communities throughout the State of Ohio." As stated by the chief administrative officer for Shaker Heights, the "focus of [CPOC] was to advocate for the preservation of the Ohio Estate Tax or, at least, to preserve for local governments the same amount of revenue that they received through the estate tax."

{¶5} CPOC's by-laws state that it was established to: (1) act as an ad hoc organization of communities to advocate for the purposes of CPOC, (2) enter into a contract with "one or more private individuals, corporations, partnerships or other organizations for public relations advice, assistance and activity," (3) enter into a contract "for lobbying services and activities to foster and advance the purposes of CPOC," and

---

[1] R.C. 5731.02(A) was amended in 2011 to make the estate tax effective for "every person dying on or after July 1, 1968 and before January 1, 2013 * * *." In other words, the estate tax no longer applies to deaths occurring on or after January 1, 2013.

(4) to take other action or positions that the members might deem to be done in furtherance of the purpose of the CPOC.

{¶6} The CPOC by-laws provided that each participating member would make a minimum payment of $5,000 within seven days of joining CPOC. Shaker Heights was designated as CPOC's fiscal agent and the Shaker Heights director of finance was designated as CPOC's fiscal officer. In their resolutions authorizing the agreement to join CPOC, both Loveland and Oakwood authorized expenditures of $5,000. Shaker Heights authorized a total of $150,000 in payment to Burgess & Burgess Strategists, Inc. and Government Strategies Group, LLC, to provide public relations and lobbying services, respectively. The contracts were awarded without competitive bidding.

{¶7} DeFranco, a Shaker Heights resident, sent a letter to the Shaker Heights law director outlining her objections to the city's participation in CPOC, maintaining that using city money to fund CPOC constituted a misapplication of funds. She demanded that the law director institute an action under R.C. 733.56 to enjoin the misapplication of those funds or the abuse of the city's corporate powers.

{¶8} The law director filed this declaratory judgment action on behalf of the four named governments, seeking a determination that a council of governments "includes a municipality's authority to engage professional services for lobbying and market functions that may be performed extraterritorily" and that Shaker Heights was authorized to enter into a lobbying agreement "without competitive bidding."

{¶9} DeFranco filed a Civ.R. 12(B)(6) motion to dismiss the complaint on grounds that the complaint merely sought an advisory opinion and that she was not a proper party to the action. The court denied the motion to dismiss, finding that DeFranco's claim that she was not a proper party was contradicted by DeFranco's own demand that the law director of Shaker Heights institute suit under R.C. 733.56 and that the statute specifically states that "the taxpayer may be named as a party defendant and if so named shall have the right to assist in presenting all issues of law and fact to the court in order that a full complete adjudication of the controversy may be had." DeFranco then filed a counterclaim for declaratory relief consistent with her demand letter.

{¶10} The governments sought summary judgment on grounds that they were allowed to join together to form a council of governments to advocate against the repeal of the estate tax. They argued that the funding they received from estate tax proceeds entitled them to engage the assistance of professionals to "recommend" to state legislators that the estate tax not be repealed and that this action encompassed an expenditure grounded in a "public purpose." They also argued that the lobbying contracts were exempt from public contracting laws because they involved "personal services" that they claimed were routinely exempted from public bidding requirements.

{¶11} DeFranco's motion for summary judgment conceded that the governments could validly lobby state officials, but argued that the sole issue before the court was whether governments could apply public funds toward the cause of imposing taxes on Ohioans living outside the governmental borders. She argued that a council of

governments could only exercise the powers that the individual governments could exercise on their own and that the Home Rule Amendment to the Ohio Constitution limited municipal powers to self-government "within their limits." She noted that when a municipal proceeding affects not only the municipality itself but the surrounding territory beyond its borders, the proceeding is no longer one that falls within the sphere of local self-government. Lobbying against the repeal of the estate tax, DeFranco argued, would substantially affect citizens beyond the territorial borders of the governments because, if successful in their efforts to defeat repeal of the estate tax, it would have the effect of continuing to impose a tax on eligible citizens throughout the state and not just in the member governments.

{¶12} The court held that the governments acted within their lawful power to join a regional council of governments for purposes of lobbying the state government. Recognizing that the right of self-government meant that individual governments could not act beyond their territorial boundaries, the court found that "the general laws recognize the right of local governments to lobby the state government to adopt or repeal *any* legislation" and that the ability to join a council of governments enabled the members of the council to lobby as a collective. (Emphasis sic.) The court also found that expenditures for lobbying served a public purpose objective as that phrase might, in the governments' discretion, be deemed to be a matter affecting the public welfare. The loss of operating income so obviously affected the governments that they could rationally view the retention of the estate tax as a matter of public welfare for their citizens.

## II

**{¶13}** DeFranco first argues that the court erred by finding that "municipalities and townships have authority to lobby." She maintains that townships in general, and Springfield Township in particular, have no power to lobby because they are statutory creations whose power is limited to that which is expressly delegated to them by statute. She argues that the General Assembly has authorized township lobbying only through the Ohio Township Association.

**{¶14}** "Townships are creatures of the law and have only such authority as is conferred upon them by law." *State ex rel. Schramm v. Ayres*, 158 Ohio St. 30, 33, 106 N.E.2d 630 (1952). Local governments "are invested only with limited powers" and can only engage in transactions that are authorized by statute, so "the authority to act in financial transactions must be clear and distinctly granted, and, if such authority is of doubtful import, the doubt is resolved against its exercise in all cases where a financial obligation is sought to be imposed upon the county." *State ex rel. Locher v. Menning*, 95 Ohio St. 97, 99, 115 N.E. 571 (1916).

**{¶15}** Springfield is a limited home rule township created under R.C. Chapter 504. R.C. 504.04(A)(1) states that limited home rule townships may, by resolution,

> [e]xercise all powers of local self-government within the unincorporated area of the township, other than powers that are in conflict with general laws, except that the township shall comply with the requirements and prohibitions of this chapter * * *.

**{¶16}** DeFranco argues that Springfield Township lacked any authority to participate in the CPOC because it was limited to membership in the Ohio Township Association. She cites R.C. 505.241, which states that a "board of township trustees may authorize its elected officers to join an association or nonprofit organization formed for the improvement of township government" as authority for the proposition that townships must lobby exclusively through the Ohio Township Association.

**{¶17}** We do not read R.C. 505.241 as limiting township lobbying solely through the Ohio Township Association. That section states only that a township board of trustees may authorize its elected officers to join an association formed for the improvement of township government. It says nothing about the Ohio Township Association, much less that the Ohio Township Association is the sole body through which a township may engage in lobbying. In short, R.C. 505.241 does not expressly limit townships from belonging to an organization other than the Ohio Township Association.

**{¶18}** In fact, R.C. 167.01 specifically authorizes townships to join a council of governments that is not limited solely to townships.

> [G]overning bodies of any two or more counties, municipal corporations, *townships*, special districts, school districts, or other political subdivisions may enter into an agreement with each other, or with the governing bodies of any counties, municipal corporations, townships, special districts, school districts or other political subdivisions of any other state to the extent that laws of such other state permit, for establishment of a regional council consisting of such political subdivisions. (Emphasis added.)

**{¶19}** Although a council of governments is not specifically authorized to lobby under R.C. 167.01, that activity is reasonably implied by R.C. 167.03(C), which permits a council of governments to "perform such other functions and duties as are performed or capable of performance by the members and necessary or desirable for dealing with problems of mutual concern."

**{¶20}** Governmental subdivisions may engage in the outright advocacy of issues of importance to them, including lobbying other governmental officials. R.C. 101.70(A) defines a "person" for purposes of lobbying as, among things, "any county, township, municipal corporation, school district, or other political subdivision of the state[.]" A "person" may engage a "legislative agent" to actively advocate on his behalf. R.C. 101.70(E) defines "actively advocate" as "advocate, or oppose the passage, modification, defeat, or executive approval or veto of any legislation by direct communication with any member of the general assembly * * *." Therefore, townships and municipal corporations are persons who may engage a legislative agent for purposes of opposing the repeal of the estate tax.

**{¶21}** It is true that R.C. 101.70 is a definitional provision, but that fact has no bearing on Springfield's right to lobby. R.C. 1.47(C) states that "in enacting a statute, it is presumed that * * * a just and reasonable result is intended." Moreover, it is a "rule of statutory construction that a statute should not be interpreted to yield an absurd result." *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 25. It would be absurd for the legislature to define a township as a "person" for

purposes of the lobbying statutes if it did not intend to grant a township the authority to lobby, either on its own or through a legislative agent. To hold otherwise would render any mention of townships in R.C. Chapter 101 nugatory. There is one "cardinal canon" of statutory interpretation above all others: "a legislature says in a statute what it means and means in a statute what it says[.]" *Connecticut Natl. Bank v. Germain*, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Having listed townships as persons entitled to engage in active advocacy, the legislature plainly intended to grant that power to them.

**{¶22}** It follows that, by entering into CPOC, Springfield joined a council of governments to perform collectively that which it was authorized to perform on its own. Advocating for the defeat of an effort to repeal the estate tax was a legitimate exercise of Springfield's authority as a township, so its membership in CPOC for that same purpose was likewise authorized.

### III

**{¶23}** DeFranco next argues that regardless of whether Springfield or the three plaintiff cities were authorized to lobby for the repeal of the estate tax, they had no authority to spend money on a purpose that would affect those outside each government's territorial boundaries. She maintains that municipalities have limited powers of self-government and may only exercise those powers within their borders. By advocating for the estate tax, the four governments had the effect of altering the public policy of municipalities and townships "that would rather not levy that tax."

**{¶24}** The "Home Rule Amendment," Section 3, Article XVIII of the Ohio Constitution states: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

**{¶25}** Home rule powers have been defined as "such powers of government as, in view of their nature and the field of their operation, are local and municipal in character." *State, ex rel. Toledo v. Lynch*, 88 Ohio St. 71, 97, 102 N.E. 670 (1913). In *Beachwood v. Cuyahoga Cty. Bd. of Elections*, 167 Ohio St. 369, 371, 148 N.E.2d 921 (1958), the Ohio Supreme Court stated:

> The power of local self-government granted to municipalities by Article XVIII relates solely to the government and administration of the internal affairs of the municipality, and, in the absence of statute conferring a broader power, municipal legislation must be confined to that area. (*See Prudential Co-Operative Realty Co. v. City of Youngstown*, 118 Ohio St., 204, 160 N.E. 695.) Where a proceeding is such that it affects not only the municipality itself but the surrounding territory beyond its boundaries, such proceeding is no longer one which falls within the sphere of local self-government but is one which must be governed by the general law of the state.
>
> To determine whether legislation falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. If the result affects only the municipality itself, with no extra-territorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality. However, if the result is not so confined it becomes a matter for the General Assembly.

{¶26} To the extent that CPOC's advocacy against the repeal of the estate tax had extraterritorial consequences, those consequences were so ancillary to the exercise of home rule powers that they did not fall outside the sphere of local self-government.

{¶27} "The Home Rule Amendments do not restrict a city to involvement solely in its own territory and do not prevent a city from acting in its interest outside the city limits * * *." *In re Petition for Annexation to the city of Westerville 162.631 Acres in the township of Blendon*, 52 Ohio App.3d 8, 556 N.E.2d 200 (10th Dist.1988). Indeed, "[t]he existence of adverse extraterritorial effects does not automatically mean an ordinance is not a matter of self-government." *Lima v. State*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, ¶ 44, citing *Cleveland v. Shaker Hts.*,30 Ohio St.3d 49, 30 OBR 156, 507 N.E.2d 323 (1987), paragraph two of the syllabus ("adverse extraterritorial traffic effects on a neighboring municipality are not, standing alone, enough to overcome the presumption of the validity of a legislative enactment taken under a municipality's home rule powers"). Municipal regulations will be invalidated only when they have "significant" extraterritorial effects. *State ex rel. Evans v. Moore*, 69 Ohio St.2d 88, 90, 431 N.E.2d 311 (1982). This is because the home rule authority "confers a high measure of sovereignty upon municipalities[.]" *Cleveland v. Shaker Hts.*, 30 Ohio St.3d at 51. Legislation enacted under the home rule powers will be invalid only when it is a matter of "statewide" concern; that is, a matter requiring state uniformity.

{¶28} The authorization to lobby carries with it the ancillary effect that some living outside of the municipality might be adversely affected by the lobbying. This is a

necessary and foreseeable consequence of the statutory authority to advocate and lobby the General Assembly under R.C. 101.70(E). The General Assembly must have understood that a municipality's advocacy on an issue would have an effect of some kind on those taking the opposite side of the issue. Indeed, it would have been pointless for the legislature to authorize governments to advocate and lobby on matters of concern to them, yet limit such advocacy to the extent that it conflicted with contrary positions held by those outside a government's borders.

{¶29} Suppose that two municipalities lobby the General Assembly for placement of a state office within their respective borders: DeFranco's argument, if taken to its logical conclusion, would bar the use of public funds to lobby for this purpose because the placement of the state office in one municipality would necessarily be to the detriment of the other municipality. Yet there is no authority for the proposition that a municipality cannot use public funds to lobby for this purpose. Indeed, lobbying of this kind is generally accepted because it involves the internal affairs of each municipality. *See State ex rel. McClure v. Hagerman*, 155 Ohio St. 320, 324, 98 N.E.2d 835 (1951), quoting 38 American Jurisprudence, Municipal Corp., Section 395 ("It is well settled that if the primary object of an expenditure of municipal funds is to subserve a public purpose, the expenditure is legal although it may also involve as an incident an expenditure which, standing alone, would not be lawful.") That the resolution of an issue might have some extraterritorial effect does not mean that the lobbying did not serve a primarily internal purpose. CPOC acted from a self-interested perspective by advocating against the repeal

of the estate tax, so to the extent its goals conflicted with those outside its members borders, any extraterritorial effect was purely ancillary.

**{¶30}** The court correctly recognized the ancillary nature of CPOC's advocacy by distinguishing *Beachwood*. *Beachwood* involved a proceeding seeking detachment of a portion of a village into a township. The supreme court found that the result of a detachment proceeding was a "change not only in the boundaries of a municipality but also in the boundaries of another political subdivision of the state." *Beachwood*, 167 Ohio St. at 371. Detaching a portion of one government into another thus had a direct effect on neighboring communities, as opposed to the ancillary effects resulting from lobbying against the repeal of a law.

**{¶31}** We likewise find DeFranco's reliance on *Cleveland v. Artl*, 62 Ohio App. 210, 23 N.E.2d 525 (8th Dist.1939) to be misplaced. In *Artl*, we expressed concerns over the city's use of public funds to compensate councilmen for expenses incurred on trips to the state capitol "for the purpose of advising and urging the Governor and members of the Legislature of impending relief crises and the urgency of enactment of relief legislation." *Id.* at 212. We found that this was not a proper use of public money, stating that "[c]ouncilmen could become lobbyists as well as legislators and remunerate themselves in their dual capacity. We know of no such power or authority in constitutional or charter provision." *Id.* at 213. The evidence in this case shows that no elected officials sought compensation for lobbying and, in fact, delegated that task to registered lobbyists. In any event, *Artl* predated the enactment of R.C. 167.01 by 28 years, so it is no longer

precedent for the proposition that municipalities may not actively advocate to the General Assembly.

**{¶32}** CPOC's lobbying efforts were primarily intended to preserve estate tax revenue. Whether this was a wise use of municipal and township funds is not for us to question. We hold that the CPOC members could use public money to fund lobbying efforts that had a primary purpose germane to the individual CPOC members, even though that same lobbying might have some extraterritorial ancillary effect.

**{¶33}** Judgment affirmed.

It is ordered that appellees recover of appellants their costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MELODY J. STEWART, PRESIDING JUDGE

COLLEEN CONWAY COONEY, J., and
SEAN C. GALLAGHER, J., CONCUR