[Cite as *Osbourne v. Van Dyk Mtge. Corp.*, 2013-Ohio-332.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| THOMAS G. OSBOURNE, et al., | : | |
| Plaintiffs-Appellants, | : | CASE NO. CA2012-03-020 |
| | : | O P I N I O N |
| - vs - | | 2/4/2013 |
| | : | |
| VAN DYK MORTGAGE CORPORATION d.b.a. FOREMOST MORTGAGE, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2009-CVH-01257

Curt C. Hartman, 3749 Fox Point Court, Amelia, Ohio 45102, for plaintiff-appellant, Thomas G. Osbourne

Michael A. Galasso, 7 West 7th Street, Suite 1400, Cincinnati, Ohio 45202, for defendants-appellees, Van Dyk Mortgage Corporation dba Foremost Mortgage, Troy A. Burd and William T. Bitter

Kerrie K. Matre, 11800 Conrey Road, Suite 200, Cincinnati, Ohio 45249, for defendant, Michael D. Behrens

**HENDRICKSON, P.J.**

{¶ 1} Plaintiff-appellant, Thomas Osbourne, appeals from multiple judgments of the

Clermont County Common Pleas Court which awarded judgment to defendants-appellees,

Van Dyk Mortgage Corporation dba Foremost Mortgage ("Van Dyk Mortgage"), Troy Burd, and William T. Bitter.

{¶ 2}  In October 2005, appellant and his wife, Ruby (together, the "Osbournes"), were on a fixed retirement income of approximately $1,477 per month, which was placed in a joint checking account from which all their expenses were paid.  The Osbournes' monthly payments on multiple mortgages took up approximately $800 of their monthly income.  Consequently, the couple sought to refinance the mortgages on their residence as well as pay off credit card debt.  For these purposes, the Osbournes sought out the assistance of Van Dyk Mortgage, whom appellant had heard about through an advertisement in *Reach* Magazine.

{¶ 3}  During their first meeting with Van Dyk Mortgage on October 12, 2005, the Osbournes dealt with Troy Burd and William T. Bitter.[1]  Burd was a potential new employee for Van Dyk Mortgage and was spending two weeks "shadowing" Bitter, the Van Dyk Mortgage branch manager, in order to determine whether Van Dyk Mortgage would be a good fit.  According to Bitter, Burd was essentially an assistant to Bitter and would help Bitter perform his job duties.  Burd did not receive compensation for his work and did not work regular business hours.  At some point during the first meeting with Burd and Bitter, appellant asserts that Burd presented the Osbournes with his business card which indicated that Burd was a "Certified Mortgage Advisor" with Van Dyk Mortgage.  Appellant would later learn, however, that Burd was neither certified nor licensed as a "mortgage advisor" within the state of Ohio.

{¶ 4}  The October 12, 2005 meeting consisted of Burd and Bitter reviewing the Osbournes' financial records and interviewing the couple.  During the interview, appellant

---

1. The parties are in dispute as to whether Bitter was a party to this initial meeting.

believes he and Ruby indicated their intention to refinance their current mortgages into a 30-year fixed rate loan. Burd and Bitter, however, recall that the Osbournes requested a home equity line of credit for a 30-year term with a variable interest rate. Burd and Bitter had the Osbournes read and sign approximately ten documents in relation to the refinancing including a Uniform Residential Loan Application, a Truth-in-Lending Disclosure Statement, and a Mortgage Loan Origination Agreement. Some of the paperwork signed by the Osbournes had the acronym "ARM" checked, indicating that the Osbournes were requesting an "adjustable rate mortgage." However, appellant contends that the meaning of "ARM" was never explained to him or his wife.

{¶ 5} After the October 12, 2005 meeting, Burd arranged for an appraisal to be performed on appellant's residence for which appellant personally paid $275 to Ace Appraisals. Bitter then reviewed the application and determined that Van Dyk Mortgage would be unable to acquire a loan for the Osbournes due to their financial situation. According to Van Dyk Mortgage, it was at this point that the relationship between the Osbournes and Van Dyk Mortgage began to end. Bitter contacted Ruby Osbourne by telephone and informed her that Van Dyk Mortgage was unable to arrange a loan for the couple. Then, upon request from Ruby Osbourne, Bitter referred the Osbournes to Mortgage Funding USA, LLC ("Mortgage Funding"), another mortgage broker that Bitter believed could acquire a loan for the Osbournes. After receiving a telephone call from Ruby Osbourne wherein she requested that the Osbournes' loan application be sent to Mortgage Funding, Van Dyk Mortgage asserts that its relationship with the Osbournes was terminated and a "dead letter" was sent to the Osbournes on November 2, 2005. Van Dyk Mortgage further contends that it received no referral fee or other benefit for recommending to Ruby Osbourne that the Osbournes seek the services of Mortgage Funding.

{¶ 6} Appellant, however, has a different interpretation of events. According to

appellant, without his or his wife's knowledge, Van Dyk Mortgage arranged for Mortgage Funding to broker a refinancing of the Osbournes' mortgages with a home equity line-of-credit and variable interest rate provided by GB Home Equity. The loan covered nearly 100 percent of the value of the Osbournes' residence but, according to appellant, was not the loan initially agreed upon between the Osbournes and Van Dyk Mortgage. It was not until the monthly payments on their mortgage with GB Home Equity began to increase that the Osbournes realized they had agreed to a loan with a variable interest rate. Appellant admits, however, that, beyond the initial interview with Van Dyk Mortgage on October 12, 2005, the only contact between Van Dyk Mortgage and the Osbournes was with Ruby Osbourne. Appellant was never privy to any telephone conversations between Van Dyk and Ruby Osbourne.

{¶ 7} Though the parties do not agree on how Mortgage Funding entered into the scenario, nor whether Van Dyk Mortgage was part of the final closing of the loan between the Osbournes and GB Home Equity, the parties do agree that the loan was closed in Ruby Osbourne's name only as "trustee." Appellant was not a party to the loan and only executed the mortgage as collateral for the loan to Ruby Osbourne. The parties further agree that only Ruby Osbourne's name was on the loan because Van Dyk Mortgage told the Osbournes' that appellant's credit score was lower than his wife's.

{¶ 8} In 2008, approximately three years after the closing of the loan between the Osbournes and GB Home Equity, Van Dyk Mortgage closed its Cincinnati office and destroyed the file relating to the Osbournes' loan application as it was considered a "dead file," or a file where the loan was never brokered. Around this time, the Osbournes' variable interest rate on their loan and mortgage with GB Home Equity began to rise, requiring a monthly payment of approximately $750, similar to the amount the Osbournes were paying prior to the refinancing.

{¶ 9} Due to the increase in their monthly mortgage payment, the Osbournes commenced the within action on June 16, 2009 against Van Dyk Mortgage, Burd, and Bitter alleging claims for: (1) violations of the Ohio Mortgage Brokers Act (OMBA or Act), R.C. 1322.01, et seq., (2) breach of fiduciary duties, (3) negligence, (4) fraud, (5) breach of confidentiality, (6) aiding and abetting these aforementioned claims, (7) conspiracy to commit these aforementioned claims, and (8) declaratory judgment for violating the OMBA.[2]  On March 15, 2010, the claims filed in relation to Ruby Osbourne were referred to arbitration per the language of the loan documents signed by Ruby.  On April 8, 2010, notice was presented to the trial court of Ruby Osbourne's death and her claims were eventually dismissed with prejudice on March 1, 2012, leaving only the claims of appellant.

{¶ 10} On September 30, 2010, the trial court granted, in part, and denied, in part, cross-motions for summary judgment of the parties relating to appellant's claims. Specifically, the trial court granted judgment in favor of appellees as to the claims for breach of fiduciary duties, negligence, fraud, breach of confidentiality, aiding and abetting, and conspiracy.  However, the trial court denied both parties' motions for summary judgment as to appellant's claims for money damages and a declaratory judgment in relation to the OMBA. Subsequently, a one-day bench trial was held on October 28, 2010 wherein the trial court ultimately issued a decision in favor of appellees on the OMBA claims.  Appellant then appealed, raising three assignments of error.

{¶ 11} During oral argument before this court, the issue of whether appellant is the proper party with standing to bring these claims was raised.[3]  As conceded by appellant

---

2. Claims were also initially brought by the Osbournes against Mortgage Funding but were later dismissed and are not before this court.

3. "Because the issue of standing is jurisdictional in nature, a court may raise it sua sponte." *In re Foreclosure of Parcel of Land Encumbered with Delinquent Tax Liens*, 11th Dist. No.2007-L-002, 2007-Ohio-4377, ¶ 8, citing *Buckeye Foods v. Cuyahoga Cty. Bd. Of Revision*, 78 Ohio St.3d 459, 460, 1997-Ohio-1999. *See also United States v. Storer Broadcasting Co.*, 351 U.S. 192, 197, 76 S.Ct. 763 (1956); *In re Forfeiture of John Deere*

during oral argument, as well as in his deposition, the property which appellant refinanced was placed in a trust several years prior to his 2005 meeting with Van Dyk Mortgage. Both appellant and Ruby Osbourne signed as "trustees" on the loan and mortgage documents Ruby entered into with GB Home Equity. Neither the trust documents nor any other evidence identifying the trust, trustees, and beneficiaries are in the record. Appellant admitted at his deposition that he does not know who the beneficiary of the trust is, but he "presumes" that he is the owner of the property.

{¶ 12} Appellant and Ruby filed this suit as individuals and never moved to amend the complaint to include themselves as trustees or beneficiaries. Therefore, in light of the Ohio Supreme Court's recent opinion in *Federal Home Loan Mortg. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017 (holding that standing is a requirement necessary to invoke the jurisdiction of the common pleas court), before we can review appellant's assignments of error, we must first determine whether appellant was the proper party with standing to bring these claims.

{¶ 13} Standing is a jurisdictional requirement that a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *Schwartzwald*, 2012-Ohio-5017 at ¶ 21-22; *Cleveland v. Shaker Hts.*, 30 Ohio St.3d 49, 51 (1987). "Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends on whether the party has alleged a personal stake in the outcome of the controversy." (Internal quotations omitted). *Schwartzwald* at ¶ 21, citing *Shaker Hts* at 51. "Because standing to sue is required to invoke the jurisdiction of the common pleas court, 'standing is to be determined as of the commencement of suit.'" *Schwartzwald* at ¶ 24, citing *Lujan v. Defenders of Wildlife*, 504

---

*Tractor*, 4th Dist. No. 05CA26, 2006-Ohio-388, ¶ 10; *State ex rel. Intl. Assn. of Firefighters, Local 381, AFL-CIO v. The City of Findlay*, 3d Dist. No. 5-05-21, 2006-Ohio-1774, at ¶ 17.

U.S. 555, 570-571, 112 S.Ct. 2130 (1992).

{¶ 14} In this case, appellant's claims can be divided into two categories: statutory claims pursuant to the OMBA and common law claims of breach of fiduciary duties, negligence, fraud, breach of confidentiality, aiding and abetting, and conspiracy.

{¶ 15} As to the OMBA claims, appellant relies on the statutory language of R.C. 1322.11 to give him standing to bring his claims under the OMBA. R.C. 1322.11 provides that a "buyer" who has been injured by a mortgage broker's violation of portions of the OMBA "may bring an action for recovery of damages." The Act defines "buyer" as "an individual who is solicited to purchase or who purchases the services of a mortgage broker for purposes of obtaining a residential mortgage loan." R.C. 1322.01(A). As appellant asserts in his complaint that he was an individual who was solicited by Van Dyk Mortgage to purchase their services and was damaged by Van Dyk Mortgage's violations of the OMBA, appellant had standing to bring this claim. Therefore, we will proceed to addressing appellant's assignments of error relating to the OMBA.

{¶ 16} However, whether appellant is the proper party with standing to bring his remaining claims of breach of fiduciary duties, negligence, fraud, breach of confidentiality, aiding and abetting, and conspiracy is not so clear. As indicated above, "[t]he doctrine of standing requires a litigant to be in the proper position to assert a claim or seek judicial enforcement of a duty or right." *Kormanik, Guardian v. HSBC Mtge.*, 10th Dist. No. 12AP-18, 2012-Ohio-5975, ¶ 41, citing *Irwin Mtge. Corp. v. DuPee,* 12th Dist. No. CA2011-08-144, 2012-Ohio-1594, ¶ 13. The burden is on appellant to establish that he "has a present interest in the subject matter of the litigation and that [he] has been prejudiced." *Id.*, quoting *In re Guardianship of Love,* 19 Ohio St.2d 111, 113 (1969); *Tschantz v. Ferguson,* 49 Ohio App.3d 9, 13 (10th Dist.1989).

{¶ 17} Appellant stated during his deposition that he personally paid the mortgage

payments to GB Home Equity each month and that he also personally paid a $275 fee to Ace Appraisals for an appraisal to be performed on the property. However, appellant fails to explain how he has a present interest in the subject matter of the litigation when it is unclear if he owns the property, if he is a trustee of the property, or, perhaps, if he is a beneficiary of the property. For example, appellant argues under his fraud claim that appellees made misrepresentations which caused appellant to refinance the property with a loan including a variable interest rate rather than a fixed rate. Due to this representation, appellant contends that he was damaged. Yet, if appellant is not the owner of the property that was refinanced, it is unclear how appellant, as an individual, was damaged.

{¶ 18} Since the commencement of this action, ownership of the property in this case has been unclear. Whether appellant, as an individual, has any ownership interest in the property at all is uncertain. One of the only facts that is clear in this case is that Ruby Osbourne, and not appellant, signed, as "trustee," the note and mortgage with GB Home Equity. Therefore, appellant was not required to make payments relating to that note and mortgage, though he continued to do so.

{¶ 19} Because the burden was on appellant to establish that he has a present interest in the subject matter of this litigation, and appellant has failed to do so as to his common law claims, we find that appellant did not have standing to invoke the jurisdiction of the trial court. Furthermore, to allow appellant to continue with this suit without knowing that he is the proper party would belie the purpose of the real party in interest rule "to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter." *Schwartzwald*

at ¶ 32, quoting *Shealy v. Campbell*, 20 Ohio St.3d 23, 24-25 (1985). *See also* Civ.R. 17(A).[4]

{¶ 20} Accordingly, we find that appellant has standing to bring his claims under the OMBA. We further find that appellant is not the real party in interest and lacked standing to bring his claims for breach of fiduciary duties, negligence, fraud, breach of confidentiality, aiding and abetting, and conspiracy. As such, these claims are dismissed without prejudice. *See Schwartzwald* at ¶ 40. We shall now address appellant's first and third assignments of error relating solely to his claims under the OMBA. For ease of discussion, we shall address these assignments of error out of turn.

{¶ 21} Assignment of Error No. 3:

{¶ 22} THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING JUDGMENT IN FAVOR OF THE DEFENDANTS-APPELLEES ON THE CLAIMS ARISING FROM THE VIOLATIONS OF THE OHIO MORTGAGE BROKERS ACT.

{¶ 23} In his third assignment of error, appellant argues that the trial court erred in awarding judgment to appellees on appellant's claims for violations of the OMBA and a claim for declaratory judgment concerning the OMBA. Specifically, appellant contends the trial court erred in determining that the OMBA does not apply in this case because appellant was not a "buyer" within the meaning of the Act. The trial court determined that, because appellant was not "solicited" by Van Dyk Mortgage to purchase mortgage broker services, the OMBA does not apply in this case. Appellant contends that this is an inaccurate application of the law. In determining whether a trial court has correctly applied the law, this court reviews the case under a de novo standard of review. *See Arnott v. Arnott*, 132 Ohio St.3d

---

4. Civ.R. 17(A) provides: "Every action shall be prosecuted in the name of the real party in interest. An executor * * * trustee of an express trust * * * or a party authorized by statute may sue in his name as such representative without joining with him the party whose benefit the action is brought. * * * No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substation of, the real party in interest."

401, 2012-Ohio-3202, ¶ 18; *In re Arnott*, 190 Ohio App.3d 493, 2010-Ohio-5392, ¶ 42 (4th Dist.).

{¶ 24} The OMBA is a remedial statute "designed in part to protect mortgage borrowers from wrongful conduct by mortgage brokers." *Guth v. Allied Home Mtg. Capital Corp.*, 12th Dist. No. CA2007-02-029, 2008-Ohio-3386, ¶ 41, citing *Equicredit Corp. of America v. Jackson,* 7th Dist. No. 03 MA 191, 2004-Ohio-6376, ¶ 65. As stated above, R.C. 1322.01(A) defines a "buyer" as "an individual who is solicited to purchase or who purchases the services of a mortgage broker for purposes of obtaining a residential mortgage loan." It is undisputed that appellant did not purchase services from Van Dyk Mortgage. Thus, the issue before the court is whether appellant was "solicited to purchase" the services of Van Dyk Mortgage. Appellant alleges that Van Dyk Mortgage's act of placing an advertisement in *Reach* Magazine was a solicitation which urged appellant to utilize the mortgage broker services of Van Dyk Mortgage. Appellees, on the other hand, contend that placing an advertisement in a magazine is not a solicitation and that it was appellant who solicited the services of Van Dyk Mortgage by calling the telephone number listed in the advertisement. Appellees further argue that the OMBA requires that the "individual" be the one who "is solicited," and conclude that appellant was not a "buyer" for purposes of the OMBA.

{¶ 25} The OMBA does not define "solicited." Therefore, we must give the term its common meaning. R.C. 1.42; *MP Star Financial, Inc. v. Cleveland State Univ.*, 107 Ohio St.3d 176, 2005-Ohio-6183, ¶ 8. According to Webster's Dictionary, to "solicit" is "to make petition to; to approach with a request or plea; to strongly urge." Webster's Third New International Dictionary (1993) 2169. Unfortunately, case law relating to the definition of "solicited" under the OMBA is nonexistent. Therefore, in order to determine whether placing an advertisement in a magazine is a solicitation which causes one to be "solicited," we turn for guidance to another statute involving solicitation, the Ohio Consumer Sales Practices Act

- 10 -

(CSPA). Similar to the OMBA, the CSPA is a remedial statute designed to protect consumers during consumer transactions and both acts allow for private suits in addition to actions by the Ohio Attorney General. *See Guth*, 2008-Ohio-3386 at ¶ 53; *Elder v. Fischer*, 129 Ohio App.3d 209, 220-221 (1st Dist.1998).

{¶ 26} In addressing the CSPA's use of the term "solicitation" in relation to the advertising and marketing of alcoholic beverages to underage consumers through the mass media, the United States District Court for the Northern District of Ohio determined that "[m]ass media advertising and marketing, though designed to inform and influence, do not specifically ask or request anything from any particular individual and, unlike solicitation, they require no immediate response or reaction from a consumer." *Eisenberg v. Anheuser-Busch, Inc.*, N.D. Ohio No. 1:04 CV 1081, 2006 WL 290308, * 34 (N.D.Ohio Feb. 2, 2006), vacated on other grounds by *Alston v. Advanced Brands and Importing Co.*, 494 F.3d 562 (6th Cir.2007). The court further found that "[m]ass advertising and marketing efforts do not rise to the level of personal solicitation," "do not create the same risk of undue pressure or intimidation as do acts of direct solicitation, and they are not as intrusive." *Id.* With that, the court held that "mass media advertising and mass marketing efforts do not rise to the level of 'solicitation' and do not constitute a 'consumer transaction' for purposes of the CSPA." *Id.*

{¶ 27} Alternatively, the Tenth Appellate District addressed a case involving the alleged solicitation of a consumer through mass media advertising and marketing and distinguished the case from the Northern District of Ohio's holding in *Eisenberg*. *Ferror v. Dish Network, L.L.C.,* 195 Ohio App.3d 686, 2011-Ohio-5235, ¶ 31 (10th Dist.). In *Ferror*, the Tenth District addressed *Eisenberg*, but determined that the advertisement in question in *Ferror*, a television advertisement from Dish Network, was a solicitation because the Dish Network commercial made "specific offers" and "asked for the immediate response or reaction" from viewers. *Id* at ¶ 30.

{¶ 28} In reviewing the facts of this case, as well as this pertinent case law, we find that the *Eisenberg* holding is more applicable to the case at hand. Unfortunately, the Van Dyk Mortgage advertisement from *Reach* Magazine was not made a part of the record below. The only evidence in the record is appellant's deposition testimony which did not indicate that any specific offer or request for an immediate response were included in the advertisement. Rather, appellant's testimony shows that it was he, and not Van Dyk Mortgage, who did the soliciting.

{¶ 29} Appellant states that Van Dyk Mortgage was the third mortgage broker he contacted in order to refinance his property and that he was actually speaking to a mortgage broker from Dayton, Ohio, which ultimately "led [him] to look for *Reach* – in the *Reach* [M]agazines" and place "a phone call to Troy Burd * * * ." This evidence does not support a finding that appellant was "solicited to purchase" the services of Van Dyk Mortgage but, rather, the record reflects that the only solicitation that occurred in this case was appellant soliciting the services of three mortgage brokers, including Van Dyk Mortgage. Furthermore, we cannot find that Van Dyk Mortgage's advertisement in a magazine created a risk of undue pressure or intimidation on appellant. *See Eisenberg* at 34. Appellant never indicated that he felt "petitioned" or "strongly urged" to purchase the services of Van Dyk Mortgage due to the *Reach* Magazine advertisement.

{¶ 30} Based upon the foregoing, we find that the trial court did not err in finding that appellant was not a "buyer" pursuant to R.C. 1322.01(A) and that, consequently, the OMBA was not applicable to this action. Accordingly, appellant's third assignment of error is overruled.

{¶ 31} Assignment of Error No. 1:

{¶ 32} THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO MAKE CERTAIN FACTUAL PRESUMPTIONS IN LIGHT OF THE ILLEGAL DESTRUCTION

OF PERTINENT RECORDS AND EVIDENCE.

{¶ 33} In his first assignment of error, appellant contends that the trial court erred in refusing to make certain "factual presumptions" based upon Van Dyk Mortgage's alleged violation of R.C. 1322.06 of the OMBA. Specifically, appellant argues that, because Van Dyk Mortgage destroyed the Osbournes' loan file prior to the four-year statutory retention requirement, the trial court should have made the following factual presumptions:

> (1) Van Dyk Mortgage failed to submit the Osbournes' application to any potential lender;
>
> (2) Van Dyk Mortgage failed to make any inquiry of any lender relative to providing a loan to the Osbournes;
>
> (3) The appraisal for the Osbournes' property was required by Troy Burd of Van Dyk Mortgage;
>
> (4) A letter of credit denial was never issued to the Osbournes by Van Dyk Mortgage;
>
> (5) Van Dyk Mortgage never tendered any written notification to the Osbournes that the contractual relationship between them was terminated or concluded; and
>
> (6) Van Dyk Mortgage never tendered any written notification to the Osbournes that another mortgage broker was going to provide mortgage brokerage services to the Osbournes.

{¶ 34} R.C. 1322.06(B) of the OMBA provides that "[a] registrant or licensee shall maintain records pertaining to business transacted pursuant to [R.C. 1322.01 to 1322.12] * * * for four years. * * * No registrant or licensee shall fail to comply with this division."[5] Though the record does indicate that Van Dyk Mortgage destroyed the documents in question prior to the four-year mark stated in R.C. 1322.06(B), we have previously determined that the OMBA does not apply in this case. Therefore, appellant has no cause of action under the provisions of the OMBA. Furthermore, it does not appear that a private right of action exists at all under

---

5. It is undisputed that Van Dyk Mortgage was a "registrant" in 2005.

R.C. 1322.06(B) and appellant has presented no support for his argument that "factual presumptions" should be made due to a violation. *See* R.C. 1322.11.

{¶ 35} Consequently, we find that the trial court did not err in denying appellant's request that "factual presumptions" be made due to Van Dyk Mortgage's alleged violation of R.C. 1322.06(B). Accordingly, appellant's first assignment of error is overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS-APPELLEES ON ALL CLAIMS OTHER THAN THOSE ARISING FROM THE OMBA.

{¶ 38} Appellant's second assignment of error addresses his claims of breach of fiduciary duties, negligence, fraud, breach of confidentiality, aiding and abetting, and conspiracy. However, as we have previously found, appellant failed to establish standing to bring these claims. As such, the trial court lacked jurisdiction to rule on the motions for summary judgment relating to these claims. Therefore, the assignment of error is sustained to the extent that the trial court did not have jurisdiction to rule on these claims and, consequently, should not have granted judgment in favor of appellees.

{¶ 39} For the reasons set forth above, we vacate the trial court's ruling on summary judgment relating to appellant's common law claims because appellant lacked standing to bring those claims and the trial court was, therefore, without jurisdiction to consider them. Consequently, those claims are hereby dismissed without prejudice. In all other respects, the trial court's judgment is affirmed.

{¶ 40} Judgment affirmed as modified.


RINGLAND and BRESSLER, JJ., concur.

Bressler, J., retired, of the Twelfth Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 6(C), Article IV of the Ohio Constitution.

- 14 -